STATE of Oklahoma ex rel. OKLA-
HOMA BAR ASSOCIATION,
Complainant,

v.

Thomas E. ENGLISH, Respondent.

SCBD No. 3824.

Supreme Court of Oklahoma.

May 18, 1993.

Gloria Miller White, Asst. Gen. Counsel,
Oklahoma Bar Ass'n, Oklahoma City, for
complainant.

Gary A. Rife, Perry & Rife, Oklahoma
City, (Max K. Naegler & Carol Wood, En-
glish & Wood, Tulsa, of counsel), for re-
spondent.

## OPINION

WATT, Justice.

On June 16, 1992, the Oklahoma Bar
Association ("OBA") filed a complaint
against respondent, Thomas E. English, a
member of the OBA. In its complaint, the
OBA alleged that respondent committed
three acts of professional misconduct.[1] Re-

---

1. The OBA charged that respondent violated
Disciplinary Rules 5–103(A), 5–101(A) and 1–
102(A)(4) of the Code of Professional Responsi-
bility, 5 O.S.1981, Ch. 1, App. 3. DR 5–103(A)
mandates that "[a] lawyer shall not acquire a
proprietary interest in the cause of action or

subject matter of litigation he is conducting for
a client...." DR 5–101(A) provides:

Except with the consent of his client after full
disclosure, a lawyer shall not accept employ-
ment if the exercise of his professional judg-
ment on behalf of his client will be or reason-

spondent filed a response in which he denied any professional misconduct. A trial panel was convened under this Court's Rules Governing Disciplinary Proceedings, 5 O.S.1991, Ch. 1, App. 1–A. Following a hearing, the trial panel recommended that respondent be suspended from the practice of law for one year. However, the panel also recommended that all but sixty days of the suspension be itself suspended and that respondent be placed on probation for the balance of the one year term.

In bar disciplinary matters, this Court exercises exclusive original jurisdiction as a licensing court. *State ex rel. Oklahoma Bar Ass'n v. Gasaway*, 810 P.2d 826, 830 (Okla.1991). Although the trial panel's recommendations are afforded great weight, the ultimate responsibility for deciding whether misconduct has occurred and what discipline is appropriate rests with this Court. *Id.* "Before we may impose discipline upon an attorney, the charges must be established by clear and convincing evidence." *Id.*, citing *Rules Governing Disciplinary Proceedings*, 5 O.S.1981, Ch. 1, App. 1–A, Rule 6.12, and *State ex rel. Oklahoma Bar Ass'n v. Braswell*, 663 P.2d 1228, 1232 (Okla.1983). With these directives in mind, we now examine the charges levied and facts adduced in the present action.

The OBA's complaint arose from respondent's actions surrounding a bankruptcy case in the United States Bankruptcy Court for the Northern District of Oklahoma. The record reveals that respondent prepared and filed an involuntary bankruptcy petition against Northwest Exploration Company ("Northwest"). From December of 1982 until March of 1984, respondent served as counsel to the creditors' committee in Northwest's bankruptcy case. The creditors' committee sponsored a plan of reorganization, which was confirmed in March of 1984. Pursuant to the plan, all assets of Northwest were transferred to the Northwest Exploration Company Creditors Limited Liability Trust ("Trust") and

all creditors of Northwest became beneficiaries of the Trust. From March of 1984 until July of 1988, respondent served as trustee and his law firm as counsel to the Trust.

In August of 1986, Dan Bell contacted respondent about the possibility of respondent and Bell purchasing a claim of Armco against Northwest. Bell was the chairman of the creditors' committee, which became the operating committee of the Trust, and an employee of National Supply Company ("National"), a subsidiary of Armco. Bell had first hand knowledge of the Armco claim and knew that National was selling assets to raise needed cash. Although Armco listed the claim on its books at a value of $1,000.00, the trial panel found that the claim was certainly of greater value.

At some point after their initial conversation, respondent and Bell formed a shell company, Basco, Ltd., for the purpose of buying the Armco claim. No filings were made to reflect the true ownership of the partnership and respondent rented a post office box under Basco's name for correspondence purposes. On August 25, 1986, respondent wrote a letter to Bell in Bell's capacity as credit manager for National. Therein, respondent stated that he had been contacted by a "local group" about buying some of Armco's claims in the Northwest bankruptcy. On September 15, 1986, respondent, acting as an "intermediary" for Basco, sent another letter to Bell presenting an offer of $11,750.00 to Armco for its claim against Northwest. The letter expressed that the dollar figure represented one percent of the amount of Armco's bankruptcy claim. Bell stated that he provided his supervisor with all information concerning the valuation of the claim. However, no one at National or Armco was informed of the identity of the Basco partners. After Bell's supervisor purportedly approved the sale, Bell wrote a letter to respondent accepting Basco's offer and

---

ably may be affected by his own financial, business, property, or personal interests.

Finally, DR 1–102(A)(4) states that "[a] lawyer shall not ... [e]ngage in conduct involving dishonesty, fraud, deceit, or misrepresentation."

thanking him for acting as an "intermediary for the transaction."

The sale of Armco's claim was completed on September 29, 1986. In December of 1987, the Trust made a distribution of $58,-751.95 to Basco in payment of the claim Basco purchased from Armco. The trial panel noted that respondent, in his position as trustee, recommended that total payments from the Trust be reduced, because respondent felt that the amounts being paid to creditors might jeopardize the operation of the Trust. Nevertheless, the operating committee directed the higher distributions.

When Armco became aware that it had sold a valuable asset for a rather small sum, it hired a private investigator to look into the matter. The investigator, Clyde Wilson, contacted respondent and asked him if he had any knowledge of Basco and its principles. In what the trial panel described as "stone-walling," respondent denied his involvement in Basco. During their conversations, Wilson informed respondent that Armco challenged the authorization for the sale of its claim in Northwest's bankruptcy. Based on Wilson's statement, respondent reassigned the claim to Armco and gave Armco the Trust distribution money, minus the original purchase price of the claim. In his March 7, 1988, letter to Wilson detailing the reassignment, respondent did not disclose his interest in Basco and claimed to be acting as Basco's representative. Armco has since received additional substantial Trust distributions for its claim.

Respondent finally disclosed his involvement with Basco when confronted with information confirming his purchase of the post office box in Basco's name. In April of 1988, Armco filed a federal court suit against respondent and Bell alleging fraud and RICO violations. The suit was resolved and all claims released, with respondent paying $4,000.00 in settlement of Armco's claims.

In August of 1991, the Honorable Mickey D. Wilson, Bankruptcy Judge, heard the fee application of respondent and his law firm for legal services performed for the Trust. The judge also addressed the claims of the Trust for transition costs incurred as a result of respondent's resignation as trustee and counsel for the Trust. Although Judge Wilson commended respondent and his firm for the legal services provided to the Trust, he punished respondent for his involvement in the Basco purchase by reducing the fee application by $91,576.00. That amount represented the attorney's fees directly attributable to respondent. Judge Wilson also entered judgment against respondent and Bell for $28,-977.00, which represented the amount spent for accounting made necessary by what the judge deemed was respondent's wrongdoing.

On the basis of the foregoing, we find that the OBA has established by clear and convincing evidence that respondent violated the Code of Professional Responsibility. Respondent was in a unique position as both chairman of and legal counsel to the creditors' committee. As the trial panel noted, "If ever one [was] in a position to avoid even the appearance of impropriety it was [a] person similarly situated with English." Respondent secretly purchased the Armco claim and then attempted to hide the fact of his purchase. Respondent also lied to Armco's representative when confronted about his involvement in Basco. Respondent did not reveal his interest in the transaction until it became apparent that he would be found out. We find that such misconduct warrants disciplinary action.

Having found that respondent's actions constituted professional misconduct, we next discuss mitigation. The report of the trial panel recited:

Thomas E. English has been by all accounts an excellent lawyer. His preparatory career was distinguished at the University of Oklahoma by his being elected to the Order of Coif as well as being the Editor in Chief of the Oklahoma Law Review. His legal expertise in the commercial law field, as well as bankruptcy, coupled with an extremely strong work ethic, soon brought him to be a shareholder in a large Tulsa firm.

He became recognized by his brethren in the bankruptcy bar as having particular expertise and he is known for unique abilities in complex commercial litigation. Throughout his career it became apparent that his reputation was above reproach. Good character, honesty, truthfulness and integrity seem to be bywords of all of those who dealt with Tom English. Everyone agreed that Tom English was the least likely candidate to be faced with a serious ethical complaint.

\* \* \* \* \* \*

[T]he evidence presented by witnesses who we found to be credible clearly show[s] that the instance under consideration appears to be a[n] "aberration". All witnesses were unanimous that English would never repeat anything like this conduct and all agree that there is no danger to the public.

 This Court has repeatedly emphasized that the principle purpose of disciplinary proceedings is not punishment of the involved attorney, but preservation of public confidence in the bar. *State ex rel. Oklahoma Bar Ass'n v. Todd,* 833 P.2d 260, 267 (Okla.1992); *State ex rel. Oklahoma Bar Ass'n v. Evans,* 747 P.2d 277, 280 (Okla.1987). "Every licensed lawyer is presented to the public as a person worthy of the trust of the public as to his professional integrity and expertise." *State ex rel. Oklahoma Bar Ass'n v. Samara,* 683 P.2d 979 (Okla.1984). After considering respondent's misconduct and the evidence in mitigation, we find that the paramount policy of insuring the integrity of the bar will be satisfied by suspending respondent's license to practice law for a period of one year. We note that the punishment in this case would have been more severe were it not for respondent's prior exemplary conduct, the probability that respondent will not commit future acts of professional misconduct and the lack of threat to the public if respondent continues to practice law.

The OBA has submitted an itemized Application to Assess Costs in the amount of $2,404.19. Respondent has not filed any pleading in response to the application and we hold him liable for the costs of this disciplinary proceeding.

IT IS THEREFORE ORDERED that respondent be suspended from the practice of law in the State of Oklahoma for a period of one year from the date this Opinion becomes final.

IT IS FURTHER ORDERED that respondent pay the costs of this proceeding in the amount of $2,404.19 within thirty days of the date this Opinion becomes final.

LAVENDER, V.C.J., and HARGRAVE, ALMA WILSON and SUMMERS, JJ., concur.

HODGES, C.J., concurs in part, dissents in part.

OPALA, J., with whom SIMMS and KAUGER, JJ., join, dissenting.

I would mete out much more severe professional discipline.