STATE of Oklahoma ex rel. OKLAHOMA BAR ASSOCIATION, Complainant,

v.

J. Michael BUSCH, Respondent.

SCBD No. 4068.

Supreme Court of Oklahoma.

March 12, 1996.

Rehearing Granted for Limited Purpose of Correcting Opinion; Rehearing Denied May 7, 1996.

Allen J. Welch, Assistant General Counsel, Oklahoma Bar Association, Oklahoma City, for Complainant.

Tom C. Lane, Sr., Sapulpa and John D. "Rockey" Boydston, Boydston & Reheard, Eufaula, for Respondent.

SUMMERS, Justice:

The Oklahoma Bar Association filed a six-count formal complaint against Respondent Michael Busch alleging neglect of client matters, failure to adequately keep the client informed, failure to appeal twice, and intentional misrepresentation as to the status of a case, both to the court and the client. After a hearing the Professional Responsibility Tribunal recommended discipline in the form of an eighteen-month suspension, and that after the period of suspension Respondent be sub-

ject to monitoring for his mental condition, Attention Deficit Disorder. Both parties have filed briefs, the Bar seeking a two year suspension, and the Respondent urging he be allowed to continue his practice subject to medication and supervision.

All incidents giving rise to this complaint involved Respondent's handling of Connie Bateman's medical malpractice claim.[1] Respondent filed on behalf of Bateman and her daughter a lawsuit against the doctor who delivered Bateman's daughter. The daughter, now an adult, suffers permanent physical and mental handicaps, allegedly caused by the doctor's negligence. On November 9, 1989, Bateman's motion for default judgment was granted, giving her a judgment against the doctor for ten million dollars. The doctor made no attempt to set aside the judgment.

A few months later Respondent sent the doctor a letter, stating that Respondent would not execute on any personal assets, but would instead collect from any insurance proceeds available. Respondent testified that a brief investigation led him to believe that the doctor had insurance and did not have substantial personal assets. Bateman testified that she did not agree to having such a letter sent. In response to this letter the doctor wrote to his insurance carrier, admitting negligence and making demand that it pay the policy limits. The carrier refused to pay. After further contact the insurer stated that no coverage was in effect at the time of the incident.

When it was later discovered by Respondent that the doctor had substantial amounts of money in several different bank accounts, as well as a ranch which was not his homestead and a collection of valuable antique cars, Respondent attempted to execute against his personal assets. But the letter from Respondent was upheld in a state court as being a valid covenant not to execute. Bateman was thus barred from executing against the personal assets of the doctor and has, to this date, received nothing on her ten million dollar judgment.

Bateman told Respondent to appeal the state court ruling and he agreed. He filed a Notice of Intent to Appeal. However, he failed to file a Petition in Error. He did not notify Bateman of this, and later testified that he decided not to file the appeal because he felt the chances of winning were slim.

In 1990 Respondent filed a second lawsuit for Bateman against Drumright Memorial Hospital, alleging negligence on the part of the hospital for permitting the doctor to have hospital privileges. The hospital filed a motion for summary judgment, which was sustained. Bateman asked Respondent to appeal. He agreed and filed a Petition in Error. However, due to his preoccupation with another case he filed the Petition in Error a day late. In 1991 this Court dismissed the appeal as being out of time. He did not notify Bateman of these events.

In February, 1993, Respondent appeared in front of District Judge Woodson, in a hearing to determine the enforceability of the covenant not to execute. Judge Woodson specifically questioned Respondent as to the status of the lawsuit against the hospital, and Respondent stated that the appeal was pending and he "expect[ed] a decision shortly."

During this ongoing attorney-client relationship with Bateman, she testified that he repeatedly refused to return her calls as to the status of her case. Respondent's secretary confirmed this, and stated that she repeatedly urged Respondent to tell Bateman of its status. Bateman was in the courtroom when he told Judge Woodson that the appeal was pending. She did not know it had been dismissed until she inquired with the Supreme Court Clerk's office.

Respondent testified that in June and July 1993 he was diagnosed as having Attention Deficit Disorder. Since that time he has

---

1. Count I of the complaint alleges violation of Rule 1.1 and 1.3 by signing a letter agreeing not to pursue the personal assets of the doctor. Count II alleges that he failed to appeal the district court's ruling. Count III alleges violations of Rules 1.4(a) and (b) in failing to inform Bateman of his decision not to appeal. Count IV alleges violations of Rule 1.1 and 1.3 in failing to timely appeal from the ruling in favor of the hospital. Count V alleges that he failed to inform his client that the appeal had been dismissed. Count VI alleged intentional misrepresentation to a court regarding the status of the case.

been on medication, and the problem has, for the most part, resolved itself. He continues to seek counseling for other problems in his personal life which have resulted from his disorder. He believes that his handling of the Bateman case was a direct result of Attention Deficit Disorder.

His psychiatrist testified on his behalf, stating that Respondent has done well since the implementation of a regime of medication. He stated that the general symptom of ADD is impulsive and inattentive behavior. When asked specific questions by the trial panel, he testified that ADD does not create an inability to tell the truth. However, ADD does cause impulsive and stupid behavior without thought to the consequences. He specifically stated that "Lying is not a symptom of ADD."

At the request of the trial panel the psychiatrist also submitted, in written form, a proposed program to help attorneys in Respondent's situation. The first step, and most critical, is to maintain a steady course of medication. The second step includes surveillance and monitoring of the professional practice of Respondent. The doctor suggests that someone who does not have ADD must oversee his workload. The third step includes monitoring for periods of "flooding."[2] During these periods, Respondent would need another attorney to take over his case load. This last step requires that Respondent continue his involvement with Lawyers Helping Lawyers. The doctor did not believe it necessary to inform Respondent's clients of his problem.

As for Respondent's prior history of discipline, he received a private reprimand in 1990 for his failure to respond to a grievance, a public censure in 1992 for his neglect of a client matter, and a 90 day suspension in 1993 with one years probation for neglect of a client matter. *State ex rel. Oklahoma Bar Ass'n v. Busch,* 853 P.2d 194 (Okla.1993).

The trial panel determined that Respondent's conduct violated the Rules of Professional Conduct. Specifically, the panel found: As to Counts I, II and IV Respondent

violated Rules 1.1 and 1.3 with regard to his actions (sending the letter agreeing not to execute on personal assets from the judgment in the first case, and failing to appeal the district court's rulings as to both cases) which bar Bateman from executing on the doctor's personal assets. As to Count III Respondent violated Rule 1.4(a) and (b) by failing to keep Bateman informed about her case and in failing to explain the legalities. As to Count V Respondent violated Rule 1.4 and 8.4(c) by failing to inform Bateman that the appeal against the hospital had been dismissed and misleading her to believe it was still pending. As to Count VI, Respondent violated Rules 3.3(a)(1) and 8.4(c) by making a false statement to Judge Woodson. The trial panel continued by finding that Respondent's conduct in Counts I, III, V and VI were not a result of his disorder, and "do not relate to his diagnosis [of attention deficit disorder]." It found, however, that Counts II and IV do relate to the symptoms of his disorder. The trial panel concluded that Respondent should be disciplined for his conduct in Counts I, III, V, and VI, and that after his period of suspension, Respondent should be subject to the guidelines set forth by his doctor.

 This Court's review of a disciplinary proceeding is de novo. *State ex rel. Okla. Bar Ass'n v. Kessler,* 818 P.2d 463, 466 (Okla.1991); *State ex rel. Okla. Bar Ass'n v. Perkins,* 757 P.2d 825, 828 (Okla.1988). As the licensing court exercising exclusive jurisdiction, it is the duty of this Court to review the evidence presented, along with the trial panel report, to determine whether the allegations have been proven by clear and convincing evidence. *Kessler,* at 466. "The nondelegable, constitutional responsibility to regulate both the practice and the ethics, licensure, and discipline of the practitioners of the law is solely vested in this Court." *State ex rel. Okla. Bar Ass'n v. Downing,* 804 P.2d 1120, 1122–23 (Okla.1990).

 Respondent asserts that the trial panel erred in its imposition of discipline by

**2.** Flooding is described as a neurologic phenomenon in which a person with ADD cannot focus,

despite medication and extra effort.

failing to follow the mandates of the Americans with Disabilities Act (ADA). *See* 42 U.S.C. § 12101 et seq. He asserts that as an individual with a disability recognized under the ADA[3], he is entitled to a "reasonable accommodation" for his disability, and that the trial panel's imposition of punishment is not a "reasonable accommodation."

The Bar Association rebuts Respondent's claim with several assertions. First, the Bar urges that impairment is not an excuse or defense to a charge of attorney misconduct. Citing cases from other jurisdictions, the Bar asserts that discipline is not foreclosed because the misconduct was a product of mental illness. Second, the Bar claims that the ADA does not apply to Bar disciplinary proceedings. Finally, the Bar asserts that even if the ADA does apply it does not preclude discipline, because the trial panel specifically found that four of the six counts in the complaint were not attributable to Respondent's disorder.

This is an issue of first impression, and one of great concern to the Oklahoma Bar Association and this Court. Historically, state courts have been vested with the power to determine the standards and qualification required for those seeking to practice law. *Schware v. Board of Bar Examiners*, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957). To protect the public, states "have broad power to establish standards for licensing practitioners and regulating the practice of professions." *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 792, 95 S.Ct. 2004, 2016, 44 L.Ed.2d 572 (1975). Furthermore, the state has a constitutional and substantial interest in determining whether an individual is fit to practice law. *Application of Griffiths*, 413 U.S. 717, 722–23, 93 S.Ct. 2851, 2855–56, 37 L.Ed.2d 910 (1973). This interest includes the freedom to gage on a case-by-case basis the fitness of individuals seeking to practice law. *Griffiths*, at 725, 93

S.Ct. at 2856–57. Federal courts are "particularly chary of intrusion into the relationship between the state and those who seek license to practice in its courts." *Tang v. Appellate Division of the New York Supreme Court*, 487 F.2d 138, 143 (2nd Cir.1973), *cert. denied*, 416 U.S. 906, 94 S.Ct. 1611, 40 L.Ed.2d 111 (1974).

Prior to the enactment of the Americans with Disabilities Act, courts traditionally held that mental illness did not prevent attorney discipline. Because of the importance of maintaining the integrity of the bar, courts held that discipline was necessary regardless of the reason for unfitness. However, mental infirmity might be a basis for mitigation. *See Matter of Hoover*, 155 Ariz. 192, 745 P.2d 939 (1987) (manic depression was not a complete bar to discipline but was a factor to consider when deciding the punishment); *Carter v. Gonnella*, 526 A.2d 1279 (R.I.1987) (bipolar disorder did not prevent bar discipline); *Matter of Hein*, 104 N.J. 297, 516 A.2d 1105 (1986) (alcoholism was not a defense to bar discipline). To hold otherwise would erode the public's confidence in the bar. *Hein*, at 1108. The sympathy felt for those with mental illnesses does not extend "to the point of lowering the barriers to the protection we have attempted to give to that portion of the public who are clients, especially clients who entrust their money to lawyers." *Id.*

The Americans with Disabilities Act, enacted 1990, states as its goal "equality of opportunity, full participation, independent living, and economic self-sufficiency" for disabled individuals. 42 U.S.C. § 12101(a)(8). It has been described as a "nationwide mandate to provide reasonable accommodations for disabled persons." *Petition of Rubenstein*, 637 A.2d 1131, 1136 (Del.1994) quoting Morrissey, *The Americans With Disabilities Act:*

---

**3.** We note that the Bar Association does not dispute that Respondent's disorder is recognized under the ADA. After conducting our independent research, the ADA defines "disability" as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual ..." 28 C.F.R. § 35.104 interprets this definition to include "[a]ny mental or psychological disorder such as mental retarda-

tion, organic brain syndrome, emotional or mental illness, and specific learning disabilities." Respondent's psychiatrist testified that ADD is a neurological disorder, and is recognized in the Diagnostic and Statistical Manual. He also stated that it does fall within the Americans with Disabilities Act and is mentioned in the Individuals with Disabilities Education Act of 1979.

*The Disabling of the Bar Examination Process,* The Bar Examiner, May 1993.

Relevant to this case is Subchapter II of the ADA which deals with "public entities." 42 U.S.C. § 12131 et seq. "Public entity" is defined to include "any State or local government" and "any department, agency, special purpose district or other instrumentality of a State or States or local government." *Id.* This definition has been interpreted to include many instrumentalities of the courts, such as Boards of Bar Examiners, judicial nominating commissions, and disciplinary committees. *Rubenstein,* at 1136; *Doe v. Judicial Nominating Commission for the Fifteenth Judicial Circuit of Florida,* 906 F.Supp. 1534 (Fla.1995); *In the Matter of Wolfgram,* 1995 W.L. 506002 (Cal.Bar Ct.1995). In Section 12132, public entities are prohibited from discrimination on the basis of a disability.

The Bar Association urges that the ADA is inapplicable to the association in general and more specifically, the Professional Responsibility Tribunal. The basis for this argument is that the Bar Association is not an "employer" of attorneys. However, the ADA has three subchapters. The first deals with employers, the second with public entities and the third with public accommodation. It is the second subchapter—public entities— which is involved here. *Matter of Wolfgram,* 1995 W.L. 506002 (Cal.Bar Ct.1995) (the State Bar is subject to Subchapter II, the "public entities" section, of the ADA). Clearly, the ADA applies to the Oklahoma Bar Association, an arm of this Court. *Tweedy v. Oklahoma Bar Ass'n,* 624 P.2d 1049 (Okla. 1981).

Because the parties do not dispute that the Respondent's disability falls within the purview of the ADA, and because the Oklahoma Bar Association is subject to the ADA, we next must decide what impact this Act has on Respondent's disciplinary proceeding. Thus far, the issues raised by the ADA have primarily centered in two areas: bar admissions and disciplinary proceedings. While we are obviously concerned with its effect in disciplinary proceedings, we should not disregard the reasoning used in the bar application cases.

Two states have been called upon to reconcile the duty of the bar association in monitoring and disciplining its members with the mandate of the ADA. The Florida Supreme Court, in *Florida Bar v. Clement,* 662 So.2d 690 (Fla.1995), addressed the issue when an attorney who was suffering from bipolar disorder (manic depression) was accused of ethical violations. The disciplinary referee recommended disbarment, but the attorney disputed the recommendation, urging that it violated the ADA. The Florida Supreme Court disbarred the attorney although his sickness was one recognized by the ADA.

The Court held that "the ADA does not prevent this Court from sanctioning [an attorney]." *Id.* at 700. This holding was based on two grounds. First, the conduct complained of (misuse and misappropriation of client funds) was not causally connected to his mental illness. Second, even if the conduct has been causally related:

> [T]he ADA would not necessarily bar this Court from imposing sanctions ... "A person is a 'qualified' individual with a disability with respect to licensing if he or she, with or without reasonable modifications, 'meets the essential requirements.' This requires a case-by-case analysis of the disabled person and the jobs or benefits he or she seeks. *Id.* at 687. Clement is not "qualified" to be a member of the Bar because he committed serious misconduct, and no "reasonable modifications" are possible ... Thus, while the ADA applies to the Bar, it does not prevent this Court from taking disciplinary action against Clement." (citations omitted)

*Id.* at 700.

Likewise, in *Matter of Wolfgram,* 1995 W.L. 506002 (Cal.Bar Ct.1995), a hearing judge forced an attorney into inactive status because he was unable to practice law without substantial harm or threat to his clients. The attorney suffered from severe depression. The attorney asserted that the ADA prohibited his involuntary inactive status. The California Bar Court relied on federal court decisions which have held that "disabilities which prevented an otherwise qualified employee from meeting the essential require-

ments of the job were not entitled to protections under the ADA." *Id.* at 7. Citing *Tyndall v. National Educ. Centers, Inc.*, 31 F.3d 209, 212–14 (4th Cir.1994) (teacher's disability prevented her from carrying out her job functions even with extensive accommodations); *Reigel v. Kaiser Foundations Health Plan*, 859 F.Supp. 963 (E.D.N.C.1994) (physician's shoulder injury rendered her unable to perform essential patient diagnosis) and *Larkins v. CIBA Vision Corp.*, 858 F.Supp. 1572 (N.D.Ga.1994) (panic attacks prevented a customer representative from performing essential job functions). The Bar Court agreed that the attorney should be placed on inactive status regardless of his disability.[4]

A slightly different result has occurred when the issue is bar admission rather than attorney discipline. These attacks have focused on either the questions asked on the bar application or on the examination process itself. In *Petition of Rubenstein*, 637 A.2d 1131 (Del.1994), the applicant suffered from a learning disability which kept her from passing the bar. She filed a petition requesting extra time to take both portions of the exam. The Board of Bar Examiners granted her request as to one portion but denied it as to the other. She sought relief from the Delaware Supreme Court. The Court held that once a disability is established which meets the criteria of the ADA, the public entity must make reasonable accommodations to facilitate the disabled person. As an instrumentality of the court, the Board of Bar Examiners was subject to the "reasonable accommodation" standard of the ADA. Extra time for the taking of the examination was considered a reasonable accommodation.

In *McCready v. Illinois Board of Admissions to the Bar*, 1995 W.L. 29609 (N.D.Ill. 1995), an applicant alleged violations of the ADA when he was denied admission to the bar after passing the examination. The denial was based on his mental health history which included prolonged problems with drug addiction and other mental disorders. The court held that the denial of admission was proper and did not violate the ADA.

> Under Title II, the protected class is limited to 'qualified individuals with a disability.' By protecting 'qualified individuals with a disability' (and not all individuals with disabilities), the ADA expressly recognizes that, in some cases, an individual may be unqualified by reason of the disability ... [I]t is not enough to qualified 'but for' a disability; 'the right inquiry is whether the person can satisfy the program's requirements despite his handicap.'

*Id.* at 5 (citations omitted).[5]

From the cases dealing with attorney discipline as well as those dealing with admission, we see that it is still the ultimate responsibility of the Oklahoma Bar Association to protect the integrity of the Bar, and to insure the continued confidence in the Bar by the public. Concededly, this responsibility also includes the duty to follow federal laws as they become applicable to the state.

The ADA clearly applies to the Oklahoma Bar Association, as an arm of this Court. However, unlike *Rubenstein*, we see no "reasonable accommodation" which can be made with regard to Respondent's neglect of client matters and deceit in court which would accomplish the purpose of maintaining the integrity of the Bar and promoting the public's confidence in the state's many attorneys. This Court has a constitutional duty in overseeing the Bar to insure that its members are fit to practice. *Application of Griffiths*, 413 U.S. at 722–24, 93 S.Ct. at 2855–56.

■ Our case is closer to *Clement*. As the Florida Supreme Court stated, the ADA does

---

4. The Colorado Supreme Court has been called upon to decide whether the fact that an attorney had a mental illness, termed success neurosis, could be considered as a mitigating circumstance. The attorney did not raise the Americans With Disabilities Act. The Court held that the hearing board's finding that it was not established could be upheld and that the neurosis need not be considered as mitigation. *People v. Goldstein*, 887 P.2d 634, 641 (Colo.1994).

5. For other cases involving application to the boards of bar examiners see *Clark v. Virginia Board of Bar Examiners*, 880 F.Supp. 430 (E.D.Va.1995); *Johnson v. State of Kansas*, 888 F.Supp. 1073 (D.Kan.1995); *Campbell v. Greisberger*, 865 F.Supp. 115 (W.D.N.Y.1994).

not prevent the discipline of attorneys with disabilities. This holding is consistent with prior Supreme Court law. *See Griffiths*, 413 U.S. at 725, 93 S.Ct. at 2856–57; *Goldfarb*, 421 U.S. at 792, 95 S.Ct. at 2015–2016. It is undisputed that Respondent failed to pursue an appeal in the first case and failed to timely file the petition in error in the second. We find the evidence to be clear and convincing that Respondent agreed—without his client's knowledge or permission—to pursue the ten million dollar judgment only against the doctor's insurance rather than against the doctor's personal assets. We similarly find that he told Judge Woodson that an opinion in the appeal was expected soon, when, in fact, Respondent knew that the appeal had been dismissed as untimely.

As mitigation we find that Respondent was suffering from Attention Deficit Disorder, that he is now being treated for this illness, and take that into account in the imposition of our discipline. We also note that Respondent has worked with Lawyers Helping Lawyers because of his illness.

We would be shirking our duty as the guardians of the state's bar were we to permit Respondent to avoid discipline. Such would surely erode public confidence in the bar. Respondent's client testified that due to Respondent's gratuitous letter she has received no compensation for her daughter's injuries in spite of the fact that she obtained a ten million dollar judgment. We find no excuse for Respondent's deceitful behavior in a court of this state. While his neglectful behavior may have been influenced by his ADD, his physician testified that lying is not a direct result of the illness. Because we find that the Bar Association has proven by clear and convincing evidence all counts as alleged in the complaint, we agree that discipline is necessary.

Taking his neurological deficit, now under control, into account as mitigation, Respondent is hereby suspended from the practice of law for two years and one day. After completion of the suspension, if Respondent resumes his practice, he shall be subject to the guidelines set forth by Dr. Dodson in his letter of August 1, 1995. This plan shall include Respondent's involvement with Lawyers Helping Lawyers. If disagreement as to the plan arises, Lawyers Helping Lawyers shall immediately contact the office of the General Counsel for the Oklahoma Bar Association. We also find that Respondent should be, and is hereby, assessed costs in this matter totalling $2,272.54 to be paid within thirty days of the date this opinion becomes final.

KAUGER, V.C.J., HODGES, LAVENDER and HARGRAVE, JJ., concur.

WILSON, C.J., not participating.

OPALA, Justice, with whom SIMMS and WATT, JJ., join, concurring in part and dissenting in part.

I concur in the court's view that respondent breached professional discipline and that the A.D.A. does not pose a legal impediment to imposition of sanctions; I dissent from today's suspension. I would order respondent's disbarment.