1997 OK 119

**STATE of Oklahoma, ex rel., OKLA-HOMA BAR ASSOCIATION, Complainant,**

v.

**Mark Aaron WRIGHT, Respondent.**

**Nos. SCBD 4208, OBAD 1274.**

Supreme Court of Oklahoma.

Sept. 30, 1997.

Rehearing Denied Dec. 15, 1997.

Mike Speegle, Assistant General Counsel, Oklahoma Bar Association, Oklahoma City, for Complainant.

Garvin A. Isaacs, H. Craig Pitts, Oklahoma City, for Respondent.

SIMMS, Justice:

¶ 1 An amended nine count complaint against Mark Aaron Wright, was filed by the Oklahoma Bar Association alleging neglect of client matters, failure to communicate and keep clients adequately informed, failure to appropriately safeguard client funds, failure to respond to grievances when so directed, and professional misconduct pursuant to Rule 8.4 of the Rules of Professional Conduct. 5 O.S.1991, Ch. 1, App.3–A.

¶ 2 After a hearing before the Professional Responsibility Tribunal, the tribunal found by clear and convincing evidence that Respondent violated Rules 1.3, 1.4, 1.5, and 8.4(b), (c) and (d) of the Oklahoma Rules of Professional Conduct. *State, ex rel. Oklahoma Bar Ass'n v. Braswell,* 1983 OK 63, 663 P.2d 1228, 1232 (misconduct charges against an attorney must be established by clear and convincing evidence before discipline may be imposed). The tribunal recommended discipline in the form of a minimum two year and

one day suspension and the requirement that should Respondent resume the practice of law at the conclusion of his suspension he be subject to specific guidelines, so that the public might be protected in the future.

¶ 3 Both Respondent and the Oklahoma Bar Association filed briefs. Respondent requesting the opportunity to continue his practice under conditions that he continue medical supervision and treatment for depression and agree not to practice by himself, but with at least one other attorney who could provide back-up support to clients in the event Respondent was unable to attend to the affairs of his practice. The Bar Association requests disciplinary suspension for a minimum of two years and one day, in keeping with the recommendations of the disciplinary tribunal.

¶ 4 The facts precipitating discipline against Respondent began to unfold in November and December of 1995, as Respondent was conducting a series of client recruitment seminars under the firm name of Estates/trusts, Inc., in which Respondent lectured about estate planning to prospective groups of clients. Most of the eight sets of clients listed in the counts below were retirees who attended one of Wright's seminars toward the end of 1995.

### Count I

¶ 5 Count one concerns the grievance of Mr. and Mrs. Epple. Mr. and Mrs. Epple attended one of Respondent's seminars in late November 1995. The couple met with Respondent several days later at a local restaurant and retained him, signing a joint representation agreement and retainer agreement, for the purposes of planning their estate. At the time the Epples retained Respondent they made Respondent aware of the fact that Mrs. Epple had serious health considerations, making the expeditious completion of their estate documents very important. The Epples paid a retainer of $1500.00, made in three installment payments from December 1995 to February 1996.

¶ 6 Mr. Epple testified that he had satisfactory communication with Respondent's office until the legal assistant left the office in January or February 1996; from that point forward communication ceased. The Epples even made an attempt to contact Respondent in person, traveling from Muskogee to his Tulsa office in March 1996. Mr. Epple testified that he found the office to be closed and locked with no apparent office hours kept. He left a note, taped to the door, asking Respondent to contact him. He received no response. In May of 1996, Mr. Epple filed a grievance with the Oklahoma Bar Association, expressing his dissatisfaction with having paid respondent for services that were not rendered. Wright never responded to the Epples' grievance as Complainant requested.

¶ 7 Telephone records introduced on behalf of Respondent indicate Respondent's office made two phone calls to the Epples at the end of February 1996 and three calls in March 1996. Mr. Epple did not recall the phone calls. Further, it is not clear from the phone records whether the calls were simply messages, nor is their any indication of whether Mr. or Mrs. Epple had received the call. Mrs. Epple did not testify.

¶ 8 The Epples received a form letter from Respondent's office in August 1996, stating that Wright's firm, Estates/trusts, Inc., retained the services of a new, young associate to finalize the estate work begun by Respondent. The Epples responded with a September 11, 1996 letter, declining the offer to conclude their estate matters with the new associate, due to the months with no contact and requested a refund of their retainer.

¶ 9 The Epples received estate documents from Respondent's office with a letter dated September 23, 1996, apparently ignoring the Epple's September 11, 1996 correspondence.

¶ 10 In another letter dated September 26, 1996, the Epples reiterated their desire to terminate the agreement and requested a return of their originals and the retainer. Approximately five months later, Respondent's counsel began making arrangements for the restitution of the Epple's fee with the local district attorney.

### Count II

¶ 11 Count two of the Amended complaint against Respondent corresponds to the

grievance allegations of Mr. and Mrs. R. King. Mr. R. King met Respondent through his brother, Mr. D. King, who had earlier attended a seminar conducted by Respondent. In October 1995, Mr. and Mrs. R. King retained Respondent to prepare trust documents and plan their estate, signing a written joint representation agreement, a retainer agreement and paying Respondent $1500.00. Mr. King testified that he never saw or spoke to Respondent again after their initial meeting in October 1995, despite repeated attempts to make contact with Respondent. Phone records provided by Respondent indicate that Respondent's office contacted Mr. and Mrs. R. King in November 1995. Mr. R. King testified he had no memory of such a call and Mrs. King did not testify. What remains undisputed is the fact that Mr. and Mrs. R. King paid $1500.00 for legal services they did not receive.

¶ 12 In a notarized letter to Respondent, dated December 12, 1995, Mr. and Mrs. R. King requested the representation agreement between themselves and Respondent be terminated and their money be refunded. Ultimately, the Kings submitted a complaint to the Oklahoma Bar Association in late December 1995. Despite requests by Complainant to respond to the King's grievance, Respondent did not do so. The Kings never received the trust documents requested.

### Count III

¶ 13 Count three of the complaint addresses the grievance of Mr. D. King, brother of Mr. R. King. Mr. D. King retained Respondent, via written contract in August 1995 and was assured he would receive his trust documents within a timely fashion, although Mr. King testified he did not recall a certain due date being discussed. Mr. D. King paid $1600.00 for Respondent's services. The materials were eventually supplied, more than five months after Mr. D. King retained respondent.

¶ 14 Mr. D. King made numerous attempts to contact Respondent, even traveling to Respondent's Tulsa office in December 1995 with his brother, Mr. R. King, only to find the office unattended. After repeated attempts to reach Respondent throughout November and December 1995, Respondent's legal assistant returned Mr. D. King's phone call on December 20, 1995. Respondent then called Mr. D. King back to answer some of his questions and concerns on January 3, 1996, as had been previously scheduled through the legal assistant.

¶ 15 Mr. D. King received his trust documents in January 1996. While Mr. King was initially satisfied with the completed documents, he testified he has developed some concerns and questions he is not comfortable discussing with Respondent, due to the deterioration of their attorney-client relationship.

¶ 16 Respondent did not respond to Mr. D. King's grievance when asked to do so by Complainant in a February 20, 1996 letter. The February letter required a response within twenty days. Respondent did eventually provide the Bar Association with a copy of Mr. D. King's file in May 1996, but did not otherwise respond.

### Count IV

¶ 17 Count four of the Amended Complaint alleges Mr. and Mrs. Oborny retained the Respondent after Mrs. Oborny attended a November 1995 seminar and paid Respondent $2500.00 pursuant to a retainer agreement.

¶ 18 The Obornys received living will documents shortly after payment of the retainer, in November 1995. The couple did not hear from Respondent again until January 1996, when they received a letter from Respondent's office, stating the documents were taking longer than expected to complete. In April 1996, after repeated, unsuccessful attempts to contact Respondent, Mr. Oborny submitted a complaint to the Tulsa County Bar Association and was later referred to the Oklahoma Bar Association. Respondent was sent notice of the Oborny's grievance in a letter dated July 25, 1996. The bar association demanded a response within twenty days. Wright did not respond to the Oborny's complaint.

¶ 19 The Obornys received trust documents in October 1996 and were able to essentially complete the process in February 1997, when Respondent came to their home

for the document signing. Over fourteen months had passed since the Obornys retained Wright.

## Count V

¶ 20 Count five concerns the complaint of Mr. and Mrs. Nigh, who retained Respondent after attending a December 1995 seminar. Shortly thereafter, the Nighs paid Respondent $1500.00 and signed a retainer agreement.

¶ 21 The Nighs wished to have their estate documents during a holiday period where their daughter was available to review the estate plan with them. Mrs. Nigh testified that she made Respondent very aware of the holiday plans and the necessity of receiving the documents prior to their return home to Oklahoma, even providing Respondent with their daughter's address in case the items were not complete prior to their departure.

¶ 22 In January 1996, after their return to Oklahoma and after Mrs. Nigh sent a letter requesting termination of the representation agreement and the retainer refunded, the Nighs received the estate documents from Respondent. Mrs. Nigh returned the documents unopened to Respondent's office, along with a second demand for the return of the $1500.00 and termination of the agreement.

¶ 23 The Nighs filed a complaint with the Oklahoma Bar Association. Respondent did not answer the July 1996 letter from the Bar Association, referencing the Nigh's complaint.

## Count VI

¶ 24 In Count six, the Eatons retained Respondent to plan their estate in December 1995, after attending a seminar a few days earlier. Mr. Eaton testified he eventually received satisfactory trust documents in October 1996, but was dissatisfied with the lack of communication from Respondent for over six months during the period of representation.

¶ 25 Mr. Eaton notified the Oklahoma Bar Association of his complaint against Respondent in June 1996. The Bar Association notified Respondent and demanded a response to the Eaton's complaint in a letter dated August 7, 1996. Wright did not respond.

## Count VII

¶ 26 Count seven was dismissed by Complainant at the conclusion of the tribunal hearing.

## Count VIII

¶ 27 Count eight addressed the grievance filed by Mr. and Mrs. Patton. The Pattons paid Respondent a $1500.00 retainer. They requested rough drafts of the estate documents prior to leaving for a planned trip, immediately after the 1995 Christmas holiday. The couple did receive some living will documents in November 1995, but did not hear from Respondent again until they received a form letter from Respondent's office in August 1996, over eight months later.

¶ 28 The Pattons made attempts to contact Respondent in February and March 1996, their calls were never returned. Mr. Patton testified he wrote Respondent to inform him of a March 1996 trip to Arkansas, so that they might still be reached while away. Respondent similarly did not respond. In June 1996, the Pattons made a trip to Respondent's Tulsa office, but found the office unattended. Mr. Patton then contacted the Tulsa County and Oklahoma Bar Associations to file a complaint. In July 1996, Mr. Patton sent a certified letter to Respondent requesting termination of their agreement and return of the retainer; the letter was returned unclaimed.

¶ 29 In August 1996, the Pattons received a form letter from Respondent's office, promising a status call prior to September 20, 1996. After receiving the call on September 19 from Respondent's new associate, with assurances that the work was virtually complete and no money available for a refund of their retainer, the Pattons completed a signing of their trust documents in October 1996.

¶ 30 The Pattons' July 1996 bar complaint was never responded to by Wright.

## Count IX

¶ 31 Count nine corresponds to the complaint alleged by Mr. and Mrs. Daniel. In December 1995, the Daniels paid Respondent $1650.00 for the planning of their estate, after having seen Respondent's seminar in Muskogee, Oklahoma. The couple received a draft of some of the documents shortly after their initial consultation with Respondent, but then did not hear from Respondent thereafter.

¶ 32 The Daniels filed a small claims action to recoup their $1650.00, but had yet to receive any refund of their retainer at the time of the tribunal hearing.

¶ 33 The Daniels sent a complaint to the Oklahoma Bar Association in July 1996. Notice of the grievance was sent to Respondent in September 1996, with a response demanded within twenty days. Wright did not respond.

¶ 34 In addition to the nine counts of the amended complaint, the record also contains references relating to three other client complaints that are similar in nature to the ones listed above. These complaints are referenced in the form of small claims suits and contacts with local law enforcement, but did not necessarily result in bar grievances.

## Discussion

¶ 35 Mark Wright's testimony at the tribunal hearing revealed years of treatment for depression and varying success with combinations of different medications for treatment of that depression. Wright testified his illness prevented him from adequately tending to his clients and his practice from December 1995 through most of 1996. He testified that his repeated failure to respond to the Oklahoma Bar Association was also due to his depression and that letters from the bar were not consciously singled out to be disregarded, as he was not opening any of his mail.

¶ 36 Respondent asserts a defense based upon the Americans with Disabilities Act (ADA), arguing that reasonable accommodations must be made for his disability. This Court acknowledged the ADA applies to the state bar as a "public entity." *State ex rel.*

*Oklahoma Bar Association v. Busch,* 1996 OK 38, 919 P.2d 1114, 1117. However, the Court also noted the ADA does not foreclose the Court's use of discipline for the misconduct of bar members, because "[t]his Court has a constitutional duty in overseeing the Bar to insure that its members are fit to practice." *Id.* at 1119.

¶ 37 In addition to the pervasive neglect of his clients, this Court is particularly concerned with Wright's repeated failure to respond to the Oklahoma Bar Association. With more than eight separate grievances pending against him throughout 1996, respondent received numerous requests to respond to the pending allegations. Even if Respondent did not know of the letters from the bar as he claims, since he was not opening any of his mail, he did become unmistakably aware of the bar association's efforts to contact him when he was served with a subpoena in April 1996. The process server was again called upon to serve Respondent on behalf of the bar association in September 1996, but was unable to make contact with Respondent. The process server testified he contacted Respondent's new associate twice in September 1996 and asked that Respondent contact him. The associate testified he did convey the messages to Respondent. However, Respondent never returned the messages.

¶ 38 Respondent argues, in essence, that he did not make a choice to ignore the bar association, but was unable to respond due to his illness. However, at several points during 1996, Respondent had the wherewithal to come to the office and tend to isolated legal affairs. The fact that he chose other obligations above the demands of the bar association shows a disregard for the investigative function of the bar association and the disciplinary rules.

¶ 39 In July 1996, Respondent was able to prepare documents in defense of a smalls claims action against a former client for a suit involving the demand for return of a retainer fee. In addition, Respondent testified he was able to attend a continuing legal education seminar in 1996. Respondent testified that he began reading some of his mail again in August 1996, but did not provide a

satisfactory explanation for the neglect of four separate letters from the bar association that were received in August and September 1996, each demanding a response within twenty days of receipt, nor did he provide a reason for his disregard of the repeated messages left by the process server in September 1996. Respondent was able to arrange for the services of an associate to begin employment in September 1996 and draft and distribute an introduction letter to his clients in an effort to appease those neglected. Furthermore, when Respondent apparently began limited working hours in August–September 1996, at which time he was aiding the new associate in completing the unresolved matters of 1995 and 1996, Respondent made the conscious decision to prioritize the salvaging of his practice over his obligations to respond to the Oklahoma Bar Association.

¶ 40 Finally, Respondent testified that he has been conducting a new series of seminars, only this time as an assistant to his onetime associate and not for the purposes of his own business. Despite the obvious questions raised about the propriety of embarking down such a similar path with so many previous matters unresolved, this Court does not place the marketing needs of Respondent or his colleague above obligations to comply with the response directives of the Oklahoma Bar Association. The fact Wright has managed to channel time and effort into new seminars, while nine unanswered complaints were pending is evidence Wright, at least at times, was more capable than the protestations about his illness would indicate.

¶ 41 All these things evidence Respondent's disregard for the authority that allows him the privilege to practice law, in that when his mental health allowed him to tend to business he chose other business over his obligations to respond, pursuant to Rule 5.2 of the Rules Governing Disciplinary Proceedings.

¶ 42 According to the record, Respondent made the following contacts with the Oklahoma Bar Association prior to the March 13, 1997 hearing before the disciplinary tribunal: (a) February 19, 1996 letter to the Oklahoma Bar Association from Respondent's office manager, stating that Wright "has been ill since Christmas, and is not expected back in the office on a regular basis until the first of March."; (b) May 14, 1996 fax to the Professional Responsibility Commission requesting an excuse from the hearing set the next day, with an application to appoint counsel and affidavits regarding illness and lack of financial resources to travel to the hearing; (c) May 14, 1996 overnight delivery of the Delbert King file to the bar association office, referenced in the May 14, 1996 fax; (d) May 23, 1996 letter to OBA general counsel, in which Respondent states he only just received the OBA's May 15th correspondence, reiterates his inability to respond due to illness, and is unable to meet OBA personnel in Tulsa, as he now lives outside of town; (e) November 1996 afternoon visit to the Oklahoma Bar Center at which time he was able to meet with an attorney in the general counsel's office, despite having no appointment.

¶ 43 In contrast, from January 1996 through September 1996, the record contains fourteen separate pieces of correspondence and a subpoena from the Oklahoma Bar Association General Counsel's Office directed to Respondent, each required a forthcoming answer from Respondent. These letters do not even include the efforts to contact Respondent at his office, by phone, or the unsuccessful attempts to deliver subpoenas in September 1996. The inadequacy of the four isolated contacts Wright made with the bar association is especially evident in light of the number of grievances, demands for response, and the volume of notices provided.

### Violations of the Rules of Professional Conduct

¶ 44 Charges of Professional Misconduct against an attorney must be established by clear and convincing evidence. *State, ex rel., Oklahoma Bar Ass'n. v. Busch,* 1996 OK 38, 919 P.2d 1114, 1116; *State ex rel., Oklahoma Bar Ass'n. v. Downing,* 1993 OK 44, 863 P.2d 1111.

¶ 45 We find by clear and convincing evidence Respondent violated Rule 1.3 of the Rules of Professional Conduct. Rule 1.3

states, "A lawyer shall act with reasonable diligence and promptness in representing a client." Clearly with regard to the eight counts referenced above, Respondent did not act with reasonable diligence and promptness in representing his clients, many of whom never received their estate materials and those who did received them after months of waiting.

¶ 46 We find by clear and convincing evidence Respondent violated Rule 1.4 of the Rules of Professional Conduct, requiring an attorney keep the client reasonably informed of the status of the case and explain matters so the client can make informed decisions regarding the representation. With regard to each set of clients listed in the complaint, Respondent's client communication from December 1995 throughout most of 1996 was almost completely non-existent, despite repeated attempts to contact Respondent in person and by phone.

¶ 47 We find Respondent violated Rule 1.5 of the Rules of Professional Conduct, requiring a lawyer's fee be reasonable. For those cases in which the work was not completed, Respondent's fee was unreasonable because the clients did not receive the services for which they paid. In those cases in which the work was ultimately completed, the fee was still largely unearned because the clients paid for diligent, timely representation with periodic communication, something none of them received. Rule 1.5 of the Rules of Professional Conduct offers several factors to consider in determining the reasonableness of a fee, two of which are the results obtained and any time limitations imposed. Rule 1.5(a)(4) & (5) of Rules of Professional Conduct. For each of the clients listed in the complaint, the results and time considerations do not warrant Respondent's fee.

¶ 48 We find Respondent violated Rule 5.2 of the Rules Governing Disciplinary Proceedings when he failed to respond to repeated requests for information regarding the allegations and grievances filed with the bar association.

### ·Discipline

¶ 49 Having reviewed the testimony of the two psychiatric physicians who testified

on Respondent's behalf, we find that neither has been able to determine if Respondent has a triggering mechanism for his depression and if so what that trigger might be. In addition, neither was familiar enough with Respondent's practice or the practice of law in general to offer a reasoned opinion regarding Respondent's ability to return to the practice of law. This information is especially important in light of the fact Respondent had only been stabilized on his current medication for two weeks prior to the March 1997 hearing and Respondent has a history of initial success with medication that later proves ineffective.

 ¶ 50 This Court's primary purpose in disciplining attorneys is not to punish, but to protect the public. *State ex rel. Oklahoma Bar Ass'n v. Patmon,* 1997 OK 64, 939 P.2d 1155, 1163. *State ex rel. Oklahoma Bar Ass'n v. English,* 1993 OK 68, 853 P.2d 173, 176; *State ex rel. Oklahoma Bar Ass'n v. Raskin,* 1982 OK 39, 642 P.2d 262, 267. Given Respondent's apparent instability and the inability of his physicians to offer the necessary assurances that he can adequately attend to the needs of any clients who might employ him at this time, the best interest of the public is served with Respondent's leave of the practice of law for a period, until this Court can receive the necessary assurances that Wright is capable of practicing law with the competence and diligence required of a practitioner.

¶ 51 Although not the primary goal of discipline, this Court acknowledges that disciplinary measures have a certain punitive impact as well. While this Court notes Respondent's illness and the detrimental effects it has had on his life and his practice, the record indicates Respondent has given his illness too much credit and himself not enough in addressing this misconduct. This is especially evident in Respondent's own testimony and the Proposed Findings of Fact and Conclusions of Law submitted on Respondent's behalf. In each, Respondent shows little if any willingness to accept the fact he made some choices in 1996 and that a number of people suffered as a result. Therefore, the period of suspension will also

serve to impress upon Wright his responsibility for the extensive neglect of his clients, which cannot be addressed with a simple reprimand and a caveat not to practice alone.

¶ 52 In light of Respondent's illness and the fact he has not previously been disciplined, a longer suspension or disbarment than that recommended by the Professional Responsibility Tribunal does not appear warranted.

¶ 53 For these reasons we impose a suspension of two years and one day, in keeping with the recommendation of the disciplinary tribunal. So the public might be protected, we recommend prior to reinstatement, Respondent show a stabilization of his mental state to be followed by a period of probation, wherein Respondent might be supervised to determine his successful acclimation as he returns to the stressful practice of law. At that time, the Professional Responsibility Commission might establish any other requirements to act as a safeguard in the event Respondent again becomes unable to attend to his clients.

¶ 54 Pursuant to Rule 6.16 of the Rules Governing Disciplinary Proceedings, Respondent is Ordered to pay the costs of the disciplinary proceedings, the record and cost of investigation in the amount of $4,833.01 within ninety (90) days from the date this opinion becomes final.

¶ 55 RESPONDENT SUSPENDED FOR A PERIOD OF TWO (2) YEARS AND ONE (1) DAY, REINSTATEMENT CONDITIONED AS ABOVE, AND TO PAY COSTS.

KAUGER, C.J., and HODGES, LAVENDER, HARGRAVE and ALMA WILSON, JJ., concur.

OPALA, J., concurs in part, dissents in part: I would order that Respondent be disbarred.

WATT, J., concurs in part, dissents in part, and joins OPALA, J.

SUMMERS, V.C.J., not participating.