662 So.2d 690 (1995)
THE FLORIDA BAR, Complainant,
v.
Peter Charles CLEMENT, Respondent.
No. 82,097.
Supreme Court of Florida.
November 2, 1995.
*692 John F. Harkness, Jr., Executive Director and John T. Berry, Staff Counsel, Tallahassee, and Bonnie L. Mahon, Assistant Staff Counsel, Tampa, for Complainant.
Raymond O. Gross and Louis Kwall of Gross & Kwall, Clearwater, for Respondent.
PER CURIAM.
Attorney Peter Charles Clement has petitioned this Court to review a referee's recommendation that he receive a thirty-six-month suspension. We have jurisdiction pursuant to article V, section 15 of the Florida Constitution.
The referee found Clement guilty of violating numerous Rules Regulating the Florida Bar.[1] Clement says he should not be sanctioned because he was suffering from manicdepression (or bipolar disorder) when the misconduct occurred and could not distinguish right from wrong. The Bar maintains that Clement knowingly and intentionally violated the rules, misappropriated client funds, and misrepresented information to a client. The Bar urges us to disbar Clement.
We approve the referee's findings of fact. We disapprove the referee's recommended suspension and disbar Clement because this sanction serves the purposes of attorney discipline.

I. FACTS[2]

A. Count 1
Clement and Murray Koren met in 1980, and the two developed an attorney-client and a personal relationship which the referee described as a "father/son type relationship." Clement worked as Koren's attorney until 1991, placing mortgages and preparing real estate contracts, closing documents, trust agreements, and wills. Clement did not charge Koren for his legal representation. Instead, his fees were usually paid by people who sought a loan or mortgage from Koren. Koren also loaned money to Clement and his father.
*693 Clement filed for personal bankruptcy in November 1990. He sought to discharge all outstanding loans from Koren for which he was personally responsible or had guaranteed for his father. Despite the bankruptcy filing, Koren continued to be Clement's friend and to use Clement as his attorney. Before filing for bankruptcy, Clement told Koren that he felt a moral obligation to satisfy the debts.
In December 1990 Clement met Edward Morelli, who was promoting Julio Iglesias and Willie Nelson concerts at Dunedin Stadium. Clement decided to invest in the venture and borrowed $20,000 to finance his interest.
At the same time, Clement was representing the owner of a shopping center in a foreclosure action. Clement asked Koren if he wanted to buy the shopping center. Koren sent Clement a $5000 check, made out to Clement's trust account, as an earnest money deposit if the owner accepted a contract to buy the shopping center.
Clement deposited the check into his trust account on January 7, 1991, then issued a trust account check to himself for $5000. Clement indicated in his trust account records that the funds were disbursed on behalf of Koren. Clement later admitted using Koren's funds for his own use, but said Koren authorized him to do so. He claimed that the offer to buy the shopping center had been rejected and that he wanted to use the $5000 as a loan to finance the promotion of the Dunedin concerts.
Koren, on the other hand, testified that he did not agree to loan Clement the $5000 on or before January 7, 1991. He also testified that Clement did not tell him before January 7 that the owner rejected a contract to buy the shopping center. Koren's testimony was corroborated by a letter from Koren to Clement dated January 28, 1991, which said in relevant part, "notify status of shopping center purchase. If not being sold to us, return the $5000 escrow deposit immediately." Clement admitted receiving the letter.
The referee found no corroborating evidence to support Clement's claim that he presented the owner with an offer to buy the shopping center on January 7, 1991, or that Koren agreed to loan Clement the earnest money deposit on or before that date. The referee found that Clement knowingly used Koren's $5000 with the intent to appropriate the money to his own use.
Sometime between January 28 and February 5, 1991, Koren demanded the return of his $5000. Clement asked Koren to let him use the money to finance the concerts. Koren initially refused, but agreed after Clement promised to repay the money with proceeds from ticket sales. Clement later told Koren that Morelli had stolen about $10,000 in cash from ticket proceeds, so he could not repay the money.
On February 6, 1991, Clement asked Koren for a $25,000 loan to keep the concerts from going under. Koren refused. Clement called later that day and told Koren that Anthony Montello would assume responsibility for one concert and would give Koren a promissory note secured by a mortgage on three pieces of property in return for a $25,000 loan. Clement also said Montello would make the promissory note for $30,000 so Koren would have security for the $5000 loan to Clement. Koren initially refused, but later agreed to meet with Montello. Koren instructed Clement, as his attorney, to investigate the three Montello properties to determine their equity, tax status, and mortgage status.
When Koren met with Montello in Clement's office on February 7, 1991, Clement presented Koren with a $30,000 note and mortgage on the three pieces of property. The note and mortgage bore the signatures of Anthony and Loretta Montello, but the signatures were not witnessed or notarized.
The next day Koren gave Montello a $25,000 cashier's check  but only after Clement assured Koren that he knew of no reason Koren should not make the loan. Clement did not put Koren's $25,000 into his trust account because he needed to wire $25,000 to an entertainment agency to avoid cancellation of the concert. Koren instructed Clement to have the note and mortgage recorded, and Clement agreed to do so.
*694 Clement said he was not acting as Koren's attorney for this loan, but Koren testified otherwise. The referee found clear and convincing evidence that Clement was acting as Koren's attorney, including a February 9, 1991, letter from Koren with specific instructions on legal matters regarding the Montello transaction.
The referee also found that Clement had a conflict of interest in representing Koren in the transaction because Clement's own financial interest limited his professional judgment. Clement needed Koren to loan $25,000 to Montello so the concert would not be canceled and he could recoup from concert profits the $20,000 he borrowed to finance his investment in the concert. Clement did not tell Koren about his financial interest and did not tell him of suspicions that people involved in the concert venture had connections with organized crime. Thus, Koren could not make an informed decision about the loan.
Further, Clement never had the note and mortgage witnessed or notarized and never recorded these documents. Clement gave two different accounts of why this happened. In a deposition given in the lawsuit that Koren filed to recover on the note, Clement stated that Montello asked for the note and mortgage back when Montello realized he would be personally guaranteeing it. Clement testified that he complied with the request. In the Bar proceedings, Clement testified during a grievance committee hearing that someone removed the mortgage and note from his office without his consent.
The referee found that Clement lied under oath either during his deposition or at the grievance committee hearing. In addition, the note and mortgage were never fully executed and recorded to protect Koren's interest. Thus, the referee found, Clement failed to represent Koren competently.
Clement did not respond to Koren's phone calls and letters between February and April 1991 about the status of the Montello note and mortgage. Sometime before April 25, 1991, however, he told Koren that he had recorded the note and mortgage. The referee found that Clement made a knowing and intentional misrepresentation. The referee based this finding on Clement's testimony that he lied to Koren, that he led Koren to believe everything was fine because the $25,000 payment had been made, and that Koren would be paid.
Koren learned in late April 1991 that certain documents were lost or missing. When Koren pressed Clement, Clement said the note and mortgage had not been recorded and they had been lost or stolen.
The concert was canceled because of the Gulf War. Koren lost his lawsuit against Montello because he could not prove that Montello had executed a note and mortgage for $30,000.
The referee rejected testimony from Clement's psychiatrist, Kevin Butler, about Clement's ability to distinguish right from wrong because Butler changed his testimony on four occasions.

B. Count 2
Clement represented Phillippe Tisseaux in the sale of Tisseaux's house. The contract purchase price of $105,000 included a $5000 earnest money deposit that the buyer paid to Tisseaux in Clement's presence. At the closing on September 27, 1991, the buyer gave Clement $100,000, which included a foreign check for $7000.
Clement was supposed to use $72,248.45 to pay off the mortgage. Instead, Clement issued eight checks to himself totaling $10,000 in October and November 1991. He did not pay off the mortgage. Only one check  for $600  was for fees to which Clement was entitled.
Tisseaux learned that Clement had not paid off the mortgage when the mortgage company notified him in late November or early December 1991 that his mortgage payment was two months past due. Clement told Tisseaux he would make the mortgage payments when the $7000 foreign check cleared. He did not tell Tisseaux he had used $10,000 of the funds for his own purposes.
Clement sent a trust account check to the mortgage company for the two past-due payments, but did not pay off the mortgage when the foreign check cleared on December 13, 1991.
*695 On December 15, 1991, Tisseaux demanded that Clement pay off the mortgage before he left for France for the Christmas holidays. On December 16, Clement faxed Tisseaux a copy of a trust account check for $71,964.67 dated that day and made out to Household Mortgage. Clement had only $51,000 in the trust account at the time and he did not actually mail a payoff check to the mortgage company.
When Tisseaux returned from France in January 1992, he discovered that Clement had not paid off the mortgage. Tisseaux paid another attorney between $1000 and $2000 to pursue the mortgage payoff. Clement paid off the mortgage on February 7, 1992. He borrowed $20,000 from his mother on February 7 and deposited that money into his trust account to cover the check to Household Mortgage.
Ten months later, a Florida Bar auditor obtained Clement's trust account records and found large shortages, as well as numerous negative balances and unallocated items. Clement did not tell the auditor he had used Tisseaux's funds without authorization in October and November 1991.
At a later visit, the auditor asked Clement about $20,000 deposited in the trust account on February 7, 1992. Clement explained that he had borrowed $20,000 from his mother to cover a shortage in the account. The auditor discovered a negative balance in the Tisseaux account, which resulted from checks made out to Clement. Clement falsely told the auditor that the negative balance was due in part to the buyer's failure to remit a $5000 earnest money deposit on the Tisseaux transaction. Both Clement and Tisseaux testified, however, that the buyer paid the $5000 earnest money deposit on or before closing. Clement still did not tell the auditor that the checks issued to him were actually personal disbursements unrelated to Tisseaux.
Clement also told the auditor that no clients were hurt by the shortages and that none had ever complained. He told the auditor  falsely  that he told Tisseaux about the shortage and that the shortage did not delay the Tisseaux case. In fact, however, Tisseaux was injured by Clement's unauthorized use of his funds because he had to pay another attorney to obtain the funds from Clement. The payoff of the mortgage also was delayed by about two months. Clement told the auditor this was because he was awaiting payoff of the foreign check, which had cleared in December 1991. Clement's statement was false because the delay in paying off the mortgage stemmed from Clement's theft of funds.
Clement did not tell the auditor until April 1993 that the checks issued to him in October and November 1991 and pertaining to Tisseaux were personal disbursements.
Clement admitted that he had shortages in his trust account and stipulated that he used $10,000 of Tisseaux's funds without authorization for his own purposes. He said the shortage was the result of poor record-keeping and his bipolar disorder.
The referee found that Clement knowingly appropriated Tisseaux's funds. He found clear and convincing evidence that Clement was not emotionally impaired when he used Tisseaux's funds without authorization in October and November 1991. Clement also misrepresented and deceived Tisseaux on December 16, 1991, when he told Tisseaux that he paid off the mortgage.
In recommending a thirty-six-month suspension, the referee noted that Clement was admitted to the Bar in 1978 and has no prior disciplinary record.
The referee found these aggravating factors: dishonest or selfish motive; pattern of misconduct; multiple offenses; bad-faith obstruction of disciplinary proceedings by making false statements or not being candid, especially about his trust accounts, or by engaging in other deceptive practices; and substantial experience in the practice of law.
The referee found these mitigating factors: no prior disciplinary record; personal or emotional problems; diagnosis of bipolar disorder for which he has been undergoing treatment since the summer of 1990; Clement tried to rectify the consequences of his misconduct, but not until after the disciplinary process commenced; good character and reputation; and interim rehabilitation in the form of forty or more visits to a psychiatrist or psychologist since the summer of 1990.
*696 The referee also recommended that Clement pay the Bar's costs of $17,549.33; make restitution to Tisseaux and Koren (excluding any debts that Clement discharged in bankruptcy); take two three-hour ethics seminars per year during his suspension and file reports on the courses; make five speeches a year to any bar association on the topic "I'm Proud To Be a Member of The Florida Bar and There Is a Higher Social Calling for Attorneys Than Making Money as Fast as Possible"; on reinstatement, remain on probation as long as he actively practices law and, as a condition of probation, continue to see a Board-certified psychiatrist (other than Butler or an affiliate); take all recommended or prescribed medications; and require the psychiatrist to report to the Bar every four months on Clement's condition.

II. ANALYSIS
Clement presents six issues for our review.
He first argues that the referee erred in rejecting the unrebutted expert testimony of his treating psychiatrist when the referee later relied on the psychiatrist's diagnosis that Clement suffered from a mental disorder in his mitigation and recommended sanction.
The referee says in his report:
[F]rom August 30, 1993, through December 20, 1993, Dr. Butler's expressed opinion regarding [Clement's] mental state for the time period involved in this case changed four (4) times. The evidence is clear and convincing that Dr. Butler was willing to testify to that which would assist his patient in the Bar proceeding... . I find Dr. Butler's opinion regarding [Clement's] ability to distinguish right from wrong to be unworthy of belief and reject the same in its totality.
First, a referee's findings of fact should be upheld when supported by competent, substantial evidence. Florida Bar v. Weed, 559 So.2d 1094, 1096 (Fla. 1990). We find that the record supports the referee's findings on Butler's testimony regarding Clement's ability to distinguish right from wrong. At various times, Butler stated that: Clement's mood did not stabilize until early summer 1991 and that his judgment may have been affected from early fall 1990 through spring 1991; Clement's mood did not stabilize until December 1991 and that Clement's judgment was impaired from December 1990 through 1991; he could not be sure whether Clement knew right from wrong; and Clement did not know right from wrong from late 1990 through all of 1991. The referee was in the best position to assess Butler's demeanor and credibility and found that he was unworthy of belief. Although Butler gave reasons for his changing testimony, the record supports the referee's rejection of this testimony.
Second, the Bar stipulated that Clement was suffering from manic-depression, so it was not necessary for the referee to rely solely on Butler to use that diagnosis in mitigation and in his recommendations.
Although Clement argues that it was error for the referee to reject Butler's unrebutted testimony, caselaw indicates that a fact-finder should not arbitrarily reject unrebutted testimony. Roach v. CSX Transp, Inc., 598 So.2d 246, 249 (Fla. 1st DCA 1992) (unrebutted testimony should not be arbitrarily ignored or wholly disregarded); In re Estate of Hannon, 447 So.2d 1027, 1028-29 (Fla. 4th DCA 1984) (court cannot arbitrarily ignore unrebutted testimony). The record reflects that the referee did not arbitrarily reject Butler's testimony. We find no merit to Issue 1.
As his second issue, Clement argues that the referee should not have excluded testimony from Clement's wife about her opinion of Clement's sanity at the time of the alleged offenses. Janet Clement testified extensively about her husband's behavior from 1990 through 1992. The Clements had been married almost twenty years at the time. Among the events she described as unusual behavior for Clement were: moving out of the couple's home without explanation; giving Janet Clement power of attorney, then revoking it and refusing to speak to her except through an attorney; working around the clock, but not appearing to make any more money; looking at houses he could not afford while his bankruptcy was pending; deciding to become a concert promoter; developing a plan to solve problems in the *697 Middle East; wanting to go to Hong Kong for the weekend to buy shirts on sale; taking the family to Disney World, but deciding after about a half-hour that he wanted his money back; directing traffic during a Disney parade; exhibiting bizarre behavior that came in peaks and valleys; falling asleep while cooking and causing a fire; and backing his car into the closed garage door.
After this testimony, Clement's lawyer said he wanted to ask Janet Clement whether she had an opinion about Clement's competence. The Bar objected. The referee sustained the objection and suggested a proffer. The lawyer said Janet Clement thought her husband was not competent from late 1990 through 1992, but she was not allowed to testify to that opinion. Clement argues that the referee's refusal to allow Janet Clement to give her opinion was particularly troublesome because the referee said in his final report that "Respondent also presented testimony from his wife to support his position that he was incompetent from December, 1990 to December, 1991. Respondent's wife's testimony did not indicate that from December, 1990 to December, 1991 Respondent did not know right from wrong." Clement argues that Janet Clement could not indicate whether he knew right from wrong because she was not allowed to express her opinion.
A nonexpert witness may testify to an opinion about mental condition if the witness had an adequate opportunity to observe the matter or conduct about which the witness is testifying. § 90.701, Fla. Stat. (1993); see also Cruse v. State, 588 So.2d 983, 990 (Fla. 1991) (lay opinion about a person's sanity permissible if witness testifies based on personal knowledge or observations and such knowledge or observations gained in a time reasonably proximate to the events giving rise to prosecution), cert. denied, 504 U.S. 976, 112 S.Ct. 2949, 119 L.Ed.2d 572 (1992); Hansen v. State, 585 So.2d 1056, 1058-59 (Fla. 1st DCA) (lay witness may give opinion on sanity based on impressions of defendant's behavior, but cannot testify to purely legal conclusions such as whether defendant could distinguish right from wrong), review denied, 593 So.2d 1052 (Fla. 1991). The referee should have allowed Janet Clement to give her opinion about her husband's sanity.[3]
Although this lay testimony would have been relevant to the issue of Clement's competency, the referee heard testimony that Clement's emotional state was not severe enough to warrant involuntary hospitalization and that Clement practiced law from December 1990 through December 1991. He admitted Butler's notes and records and heard Janet Clement's extensive testimony about her husband's behavior. The referee thus had adequate evidence before him to determine Clement's competency. Any error in refusing to let Janet Clement state her opinion was harmless.
Clement argues in his third issue that the doctrine of collateral estoppel prevents the Bar from raising the issue of whether Clement used Koren's funds for his personal use. This issue relates to the unsuccessful civil suit that Koren filed to try to establish that Montello owed him a debt. Clement argues that the Bar cannot litigate points and questions that were common to both the civil suit and the Bar proceedings and that were adjudicated in prior litigation, notwithstanding lack of mutuality. Thus, Clement argues, Koren's testimony should have been excluded.
Collateral estoppel is a judicial doctrine that prevents identical parties from relitigating issues that have previously been decided between them. Monyek v. Klein, 329 So.2d 25, 26 (Fla. 3d DCA 1976); Golden View Condominium, Inc. v. City of Hallandale, 279 So.2d 323, 324 (Fla. 4th DCA), cert. denied, 288 So.2d 258 (Fla. 1973). Although federal courts and some other jurisdictions no longer require mutuality of parties as a prerequisite to asserting the doctrine of collateral estoppel, Florida courts have held that collateral estoppel can be asserted only when the identical issue has been litigated between the same parties. Trucking Employees of N. Jersey Welfare Fund, Inc. v. Romano 450 So.2d 843, 845 (Fla. 1984), modified *698 on other grounds by Zeidwig v. Ward, 548 So.2d 209 (Fla. 1989).
Neither the parties nor the issues are the same in the civil suit and the instant case. In the civil suit against Montello, Koren unsuccessfully tried to establish that Montello owed him a debt. The parties in the instant case are the Bar and Clement. The issue in the Bar case is whether Clement misappropriated Koren's $5000 earnest money or whether Koren agreed to loan Clement that money on or before January 7, 1991. Because both the parties and issues are different, the doctrine of collateral estoppel does not prevent the Bar from litigating this issue.
As his fourth issue, Clement argues that the telephonic testimony of Tisseaux, a foreign witness who testified from Costa Rica, should have been excluded because the oath was not administered in accordance with section 92.50(3), Florida Statutes (1993).[4]
Before Tisseaux testified by telephone, the record reflects discussion about whether anyone could authenticate that Tisseaux was the person on the line. Clement's attorney argued, "I have no idea who this is, what number we are calling, and that in my experience when we have had a witness such as this there is someone at the other end of the line to verify who they are and to impose an oath that is acceptable to this Court." The Bar's counsel said she had previously spoken to Tisseaux at the same telephone number.
The referee swore in Tisseaux, who testified that Clement did not pay off the mortgage until several months after closing. Tisseaux said he hired another lawyer to pursue the payoff.
Florida courts have held in criminal cases that an unsworn witness is not competent to testify. See, e.g., Houck v. State, 421 So.2d 1113, 1115 (Fla. 1st DCA 1982). An affidavit that is not executed in accordance with the requirements of section 92.50(3) is not competent evidence in a civil case. Hamilton v. Alexander Proudfoot Co. World Headquarters, 576 So.2d 1339, 1341 (Fla. 4th DCA 1991).
Bar disciplinary hearings, however, are neither civil nor criminal, but are quasi-judicial. R. Regulating Fla.Bar 3-7.6(e)(1). While Clement's attorney objected to the procedure by which Tisseaux was sworn, he did not contest whether Tisseaux actually testified. Although bar disciplinary proceedings are not governed by technical rules of evidence, see Florida Bar v. Vannier, 498 So.2d 896 (Fla. 1986), it would be a better practice to comply with section 92.50(3). But, under the circumstances of this case, we find no error in the referee's failure to comply with that provision.
Even if we were to find error in allowing Tisseaux to testify, we note that Clement himself testified that he did not pay off the mortgage until several months after the sale of the house and that ledgers from Clement's trust account support this testimony. Any error, therefore, is harmless.
Clement argues in Issue 5 that the recommended thirty-six-month suspension is unduly harsh because it fails to consider mitigation, including the absence of a prior disciplinary record, absence of a dishonest or selfish motive, personal or emotional problems, and physical or mental disability or impairment. In response, the Bar urges Clement's disbarment in light of the aggravating factors and notwithstanding any mitigation.
This Court's scope of review when reviewing a referee's recommended sanction is somewhat broader than when reviewing the referee's findings of fact because the Court ultimately has the responsibility to order an appropriate sanction. Florida Bar v. Pearce, 631 So.2d 1092, 1093 (Fla. 1994). A *699 sanction must serve three purposes: the judgment must be fair to society, be fair to the attorney, and sufficiently deter others from similar misconduct. See, e.g., Florida Bar v. Poplack, 599 So.2d 116, 118 (Fla. 1992); Florida Bar v. Pahules, 233 So.2d 130, 132 (Fla. 1970).
Disbarment is the most severe sanction because it terminates a lawyer's ability to practice law. R.Regulating Fla.Bar 3-5.1(f); Fla.Stds.Imposing Law.Sancs. 2.2. The commentary to standard 2.2 indicates that disbarment enforces the purpose of sanctions by protecting the public from further practice by the lawyer and by protecting the reputation of the legal profession. Disbarred lawyers may be allowed to apply for readmission, but not until at least five years after the effective date of the disbarment. R.Regulating Fla.Bar 3-5.1(f). The presumption is against readmission, and a lawyer seeking readmission must show by clear and convincing evidence successful completion of the bar exam and rehabilitation and fitness to practice law. Id. ("A former member who has been disbarred may only be admitted again upon full compliance with the rules and regulations governing admission to the bar."); Fla.Stds.Imposing Law.Sancs. 2.2 (commentary).
Suspension is a less severe sanction than disbarment in that the suspended lawyer is removed from the practice of law for a specified period of time not to exceed three years. R.Regulating Fla.Bar 3-5.1(e); Fla.Stds.Imposing Law.Sancs. 2.3. Suspensions of ninety days or less do not require proof of rehabilitation, while suspensions of more than ninety days require proof of rehabilitation and may require passage of all or part of the bar exam.
"This Court has repeatedly asserted that misuse of client funds is one of the most serious offenses a lawyer can commit and that disbarment is presumed to be the appropriate punishment." Florida Bar v. Shanzer, 572 So.2d 1382, 1383 (Fla. 1991) (disbarment warranted for attorney who argued that his depression over personal problems led him to use funds in his trust account for personal purposes). While the referee in the instant case correctly considered Clement's mental condition in mitigation, see, e.g., Florida Bar v. Perri, 435 So.2d 827, 829 (Fla. 1983); Florida Bar v. Parsons, 238 So.2d 644, 645 (Fla. 1970), Clement's bipolar disorder continued while he was under the care of a psychiatrist. The referee rejected Butler's testimony in Count 1 regarding Clement's ability to distinguish right from wrong. The referee found clear and convincing evidence that the conduct in Count 2 occurred when Clement was not suffering from the effects of his bipolar disorder. In light of the facts of this case, we find that disbarment is the appropriate sanction.
As his sixth issue, Clement argues that the recommended discipline violates the Americans With Disabilities Act (ADA), which prohibits discrimination against people with disabilities.
Under the ADA,
The term "qualified individual with a disability" means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices ... or the provision of auxiliary aids and services, meets the essential eligibility requirements for ... the participation in programs or activities provided by a public entity.
42 U.S.C. § 12131(2). Manic-depression or bipolar disorder was recognized as a disability under the Rehabilitation Act of 1973, which was a precursor to the ADA. See Gardner v. Morris, 752 F.2d 1271 (8th Cir.1985); Hogarth v. Thornburgh, 833 F. Supp. 1077, 1084 (S.D.N.Y. 1993). Courts have considered cases decided under the Rehabilitation Act to be persuasive authority for interpreting the ADA. See Stillwell v. Kansas City Bd. of Police Comm'rs, 872 F. Supp. 682, 686 (W.D.Mo. 1995). One federal circuit has affirmed a holding that a bipolar disorder is a disability under the ADA. Carrozza v. Howard County, Maryland, 45 F.3d 425 (4th Cir.1995), aff'g 847 F. Supp. 365 (D.Md. 1994). Thus, Clement's bipolar disorder is a disability under the ADA.
Although Clement suffers from a disability as defined by the ADA, the ADA does not prevent this Court from sanctioning Clement. The referee rejected the testimony of Clement's *700 psychiatrist that Clement lacked the ability to distinguish right from wrong when these incidents occurred. The referee also found "clear and convincing evidence that [Clement] was not emotionally impaired at the time he used Mr. Tisseaux's funds without authorization in October and November, 1991." Because Clement's misconduct was not a direct result of his bipolar disorder, sanctions do not violate the ADA. See People v. Goldstein, 887 P.2d 634, 638 n. 2 (Colo. 1994) (attorney's "success neurosis" was not direct cause of misconduct; thus court rejected attorney's claim that his disbarment violated ADA because there was no causal connection between his mental illness and the misconduct).
However, even if any of Clement's actions occurred when he could not distinguish right from wrong, the ADA would not necessarily bar this Court from imposing sanctions. "A person is a `qualified' individual with a disability with respect to licensing if he or she, with or without reasonable modifications, `meets the essential requirements' for receiving the license." Stillwell, 872 F. Supp. at 685 (citing 28 C.F.R. § 35.104). This requires a case-by-case analysis of the disabled person and the jobs or benefits he or she seeks. Id. at 687. Clement is not "qualified" to be a member of the Bar because he committed serious misconduct, and no "reasonable modifications" are possible. Although Clement was under psychiatric care for his bipolar disorder when the incidents in this case occurred, Clement also said he could fool his doctor into believing that he was in control during some of the period in question. This suggests that nothing could prevent repetition of the egregious misconduct that occurred in this case.
Thus, while the ADA applies to the Bar, it does not prevent this Court from taking disciplinary action against Clement.

III. CONCLUSION
Clement is hereby disbarred. The disbarment will be effective thirty days from the filing of this opinion so that Clement can close out his practice and protect the interests of existing clients. If Clement notifies this Court in writing that he is no longer practicing and does not need the thirty days to protect existing clients, this Court will enter an order making the disbarment effective immediately. Clement shall accept no new business from the date this opinion is published. The costs of these proceedings are taxed against Clement and judgment is entered in the amount of $17,549.33, for which sum let execution issue.
It is so ordered.
GRIMES, C.J., and OVERTON, SHAW, KOGAN, HARDING, WELLS and ANSTEAD, JJ., concur.
NOTES
[1] The referee found that Clement violated the following Rules Regulating the Florida Bar: as to Count 1, rule 4-1.1; rule 4-1.3; rule 4-1.4(a); rule 4-1.4(b); rule 4-1.8(a); rule 4-1.15(a); rule 4-8.4(a); rule 4-8.4(b); rule 4-8.4(d); and rule 4-8.4(d); and as to Count 2, rule 4-1.15(a); rule 5-1.1(a); rule 5.1.1(c); rule 5-1.2(b)(5); rule 5-1.2(b)(6); rule 5-1.2(c)(1)(B); rule 5-1.2(c)(2); rule 5-1.2(c)(3); and rule 5-1.2(c)(4).
[2] These facts are drawn from the referee's findings of fact.
[3] In addition to the authority to hear this evidence provided by the Florida Evidence Code, a referee in a bar-discipline case can consider any evidence he or she deems relevant to resolving a factual question. See Florida Bar v. Rood, 620 So.2d 1252, 1255 (Fla. 1993).
[4] Section 92.50(3), Florida Statutes (1993), provides:

Oaths, affidavits, and acknowledgments, required or authorized by the laws of this state, may be taken or administered in any foreign country, by or before any judge or justice of a court of last resort, any notary public of such foreign country, any minister, consul general, charge d'affaires, or consul of the United States resident in such country. The jurat, or certificate of proof or acknowledgment, shall be authenticated by the signature and official seal of the officer or person taking or administering the same; provided, however, when taken or administered by or before any judge or justice of a court of last resort, the seal of such court may be affixed as the seal of such judge or justice.