933 P.2d 1295 (1997)
The PEOPLE of the State of Colorado, Complainant,
v.
John Kerz REYNOLDS, Attorney-Respondent.
Nos. 95SA99, 96SA33.
Supreme Court of Colorado, En Banc.
March 3, 1997.
*1296 Linda Donnelly, Disciplinary Counsel, James C. Coyle, Assistant Disciplinary Counsel, Denver, for Complainant.
John Kerz Reynolds, Denver, pro se.
PER CURIAM.
We have consolidated two separate lawyer disciplinary proceedings for the purpose of issuing one opinion and order. In No. 95SA99 a hearing panel of the supreme court grievance committee approved the findings and recommendation of a hearing board that the respondent be suspended from the practice of law for three years with reinstatement conditioned upon making restitution and demonstrating that certain emotional problems no longer impair the respondent's ability to practice law. The same hearing panel in No. 96SA33 approved the findings and recommendation of a different hearing board that the respondent be suspended for thirty days, be required to petition for reinstatement and to make certain restitution. We accept the findings and recommendations of the hearing panel and hearing boards. We therefore order that the respondent be suspended for three years in No. 95SA99, and for thirty days in No. 96SA33, with the periods of suspension to run concurrently, with reinstatement contingent upon the respondent's satisfaction of the conditions recommended in both cases.

I. No. 95SA99
The respondent was admitted to practice law in Colorado in 1973. No. 95SA99 involves three consolidated formal complaints, GC 93B-11, GC 93-26, and GC 94B-22. An order of default was initially entered in the first two complaints, but was subsequently vacated. An order of default was also entered in GC 94B-22, and the respondent's motion to vacate the default was denied. With respect to the four counts contained in GC 94B-22, therefore, the allegations of fact were deemed admitted. C.R.C.P. 241.13(b); People v. Barr, 855 P.2d 1386, 1386 (Colo. 1993). Based on the respondent's default, a stipulation of facts between the complainant and the respondent, and the evidence presented, the board made the following findings.

A.
Roxanne Eide, who was then living in Colorado, hired the respondent to represent her in a custody dispute involving a minor child and her ex-husband, Bart L. Baumeister. She paid the respondent an advance fee of $1,000 on July 13, 1992. Her marriage was dissolved in South Dakota in 1988, and she was awarded custody of the minor child. In June 1992, while the child was on an extended visit with his father in Idaho, Baumeister filed a motion in South Dakota for a change *1297 in custody. A hearing on the change of custody was set for July 13, 1992.
The respondent contacted Baumeister's lawyer and obtained a continuance by agreeing that Baumeister could have temporary custody of the child until the hearing was held. The respondent then neglected the case by failing to actively press for a hearing in South Dakota as soon as possible.
On December 15, 1992, Baumeister commenced an action in Idaho to gain custody of the child. Baumeister asked the South Dakota court to stay its proceedings until the Idaho court determined whether it had jurisdiction. The respondent's client was served in the Idaho action on January 29, 1993, and she delivered the papers to the respondent. The respondent advised her that the Idaho court did not have jurisdiction to hear the matter. He did not tell her to answer the Idaho complaint or to appear at the hearing, and he failed to contact Baumeister's Idaho lawyer. Nor did he associate with an Idaho lawyer or enter any appearance in the action even for the purpose of challenging jurisdiction.
At the hearing on March 24, 1993, the Idaho court determined that Eide was in default and the custody of the minor child was awarded to the father. When she received a copy of the Idaho order, Eide gave it to the respondent. On April 7, 1993, the respondent contacted an Idaho lawyer and asked for assistance in overturning the default judgment, but he provided no documents to the lawyer.
Eide contacted the Idaho lawyer directly on June 1, 1993, and asked him to handle the case. The lawyer filed a motion to vacate the default judgment on the grounds that Eide had relied on the respondent's advice that she need not answer the complaint. The Idaho court found that Eide's failure to answer the complaint was the result of excusable neglect. The motion to vacate the judgment was nevertheless denied because Eide had failed to establish a meritorious defense to the termination of her custodial rights, in part, the Idaho court held, because the child had been in his father's custody for almost a year.
The foregoing conduct occurred both before and after the effective date of the Rules of Professional Conduct, January 1, 1993. It therefore violated DR 6-101(A)(3) and R.P.C. 1.3 (neglecting a legal matter entrusted to the lawyer).

B.
Jan Schumacher hired the respondent in August 1992 to represent her in a dissolution of marriage proceeding, and she paid him an advance fee of $700. There were no children as a result of the marriage and the parties had resolved all of the marital property and maintenance issues.
Although he served his client's husband with a summons and a copy of the dissolution petition within three weeks of meeting the client, the respondent did not file the petition with the district court. Schumacher called the respondent often during the fall of 1992 to find out if he had filed the case, but he had not. In December 1992, the respondent told his client that the petition had been filed. This was not true. The petition was not filed with the court until January 1993.
The respondent took no further action until May 1993, when he had the permanent orders hearing set for July 16, 1993. The day before the hearing was to take place, the respondent came to Schumacher's place of work and told her that since all of the matters had already been agreed to there was no reason for the hearing and that he would have it vacated.
Schumacher repeatedly called the respondent to determine if the dissolution was final. The respondent had taken no further action on the case as of August 31, 1993, at which time Schumacher sent him a certified letter asking him to withdraw and indicating that she would file suit against him for return of the money she had paid him for work that had not been performed. The respondent did not file a motion to withdraw until October 1993 and has never provided Schumacher an accounting of his services.
*1298 The respondent's conduct violated DR 1-102(A)(4) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation); DR 6-101(A)(3) and R.P.C. 1.3 (neglecting a legal matter); DR 9-102(B)(3) (failing to maintain complete records of client property in the possession of the lawyer and to render appropriate accounts to the client regarding the property); and DR 9-102(B)(4) (failing to promptly pay or deliver to the client as requested by the client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive).

C.
On March 25, 1992, Rusty D. Riley retained the respondent to file a dissolution of marriage petition in Adams County and to file a motion for reduction of child support in a proceeding in Boulder County. The marital property, maintenance, and child custody issues had already been resolved by the parties. The respondent filed a petition for dissolution on May 4, 1992, but took no further action on the case despite Riley's numerous requests that he do so.
On May 10, 1993, the respondent told Riley, falsely, that he had filed the motion to reduce child support in the Boulder proceeding, and that a permanent orders hearing had been set in the dissolution matter. No motion for reduction of child support had been filed nor had a permanent orders hearing been set in Adams County.
Riley filed a request for investigation with the Office of Disciplinary Counsel on May 18, 1993. The respondent did nothing further on the Riley dissolution matter until October 28, 1993, when he issued a notice to set a permanent orders hearing on January 6, 1994. Riley only learned of this date when an investigative counsel at the disciplinary counsel's office informed him of it in December 1993. The respondent never filed a motion to reduce child support in Boulder County.
The respondent thereby violated DR 6-101(A)(3) and R.P.C. 1.3 (neglect); R.P.C. 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit or misrepresentation); and C.R.C.P. 241.6(4) (committing any act or omission which constitutes gross negligence).

D.
In October 1992 Carl L. Schroeder hired the respondent to file an action against United Stock Transfer and one of its agents for the alleged improper cancellation of a stock certificate issued to Schroeder. Schroeder paid the respondent $1,000 to commence the action. Although he effected service of process on United Stock Transfer in January 1993, the respondent failed to serve the agent.
In February 1993, the opposing counsel wrote a letter to the respondent confirming a prior telephone conversation concerning legal authority to the effect that Schroeder's remedy was limited to the delivery of a new stock certificate and no money damages. The respondent took no further action in the Schroeder case despite repeated requests by his client and by opposing counsel that he do so. He therefore violated DR 6-101(A)(3) and R.P.C. 1.3 (neglect), and his failure to communicate with his client violated R.P.C. 1.4.

E.
Thomas and Donna Vidamour agreed to a dissolution of their marriage and also agreed to a settlement of all pertinent issues involving child support, maintenance, and property. Donna Vidamour was to hire a lawyer who would draft a settlement agreement and forward it to her husband.
Donna Vidamour hired the respondent on April 3, 1992. The hearing board found that on her first visit she met with a nonlawyer contract employee of the respondent, Matthew Kemp. She paid Kemp an advance fee of $125 on that first visit and delivered an additional $188 to the respondent's office on May 8, 1992. Through Kemp, the respondent agreed to file the petition for dissolution, obtain temporary child support orders, prepare a settlement agreement, and prepare *1299 and obtain final orders. The Vidamours expected a speedy resolution.
Donna Vidamour was never able to contact the respondent himself, although the respondent states that he did not receive her messages. In fact, Donna Vidamour's communications were handled by Matthew Kemp, respondent's nonlawyer contract employee, who gave her legal advice on child support, custody and other legal matters. Donna Vidamour fired the respondent on June 17, 1992, and requested a refund of her advance fee and costs. The respondent never filed a petition for dissolution in the Vidamour matter, nor has he ever provided a refund or accounting for his services.
The foregoing conduct violated DR 3-101(A) (aiding a nonlawyer in the unauthorized practice of law); DR 6-101(A)(3) (neglect); DR 9-102(B)(3) (failing to render appropriate accounts to the client); and DR 9-102(B)(4) (failing to promptly return client funds upon request).

F.
The respondent was hired on May 18, 1992 to represent Rhonda Brown in a bankruptcy matter. At the initial meeting, Brown met with respondent's nonlawyer employee, Matthew Kemp. Brown made an initial payment of $100.
Later, Kemp instructed Brown to come to the respondent's office to sign papers. When she arrived, Kemp told her the papers were not ready, but he proceeded to discuss the substance of her case with her. Kemp told Brown to continue making payments on her automobile. Brown paid an additional $120 for filing fees on June 18, 1992.
On July 27, 1992, the respondent's office filed the bankruptcy petition signed by the respondent on behalf of Brown. The bankruptcy court issued a Notice of Creditors Meeting and a deadline for filing schedules. Kemp told Brown to meet the respondent at the creditors meeting on August 26, 1992. The respondent, however, failed to appear at the creditors meeting on the Brown bankruptcy on August 26. The trustee examined Brown without the respondent and concluded that the case involved no assets. The bankruptcy court accepted the trustee's report on September 15, 1992. The trustee then filed a motion for the respondent to disgorge his attorney fees in the Brown matter. The respondent was ordered to refund the fees and he complied.
The respondent never met Brown and only spoke on the telephone with her two times, both times to confirm he would take action. His conduct violated DR 3-101(A) (aiding a nonlawyer in the unauthorized practice of law), and DR 6-101(A)(3) (neglect). Because he failed to answer or otherwise respond to the request for investigation in the Brown matter, he also violated C.R.C.P. 241.6(7) (failing to respond to a request by the grievance committee without good cause shown).

G.
Tracy Hudson hired the respondent to represent him on charges of DWAI (driving while alcohol impaired) and underage alcohol consumption. Hudson was eighteen when he engaged the respondent and obtained his name from an advertisement. Hudson's first meeting was with nonlawyer employee Matthew Kemp and he provided Kemp with the information Kemp requested. Hudson signed an attorney-client agreement calling for a flat fee of $550. Hudson paid the entire fee by August 7, 1992.
The respondent failed to show up at Hudson's first appearance date, so he agreed to return $150 of Hudson's advance fee. Hudson told him that a pretrial conference was set for September 18, 1992. The respondent failed to appear at that conference. Respondent then agreed to return the $550 by September 21, 1992. In fact, the respondent has never repaid any of Hudson's fee.
He thereby violated DR 6-101(A)(3) (neglect), and DR 9-102(B)(4) (failing to promptly return client funds upon request). The respondent did not respond to the request for investigation in the Hudson matter, contrary to C.R.C.P. 241.6(7).

*1300 H.
The respondent was retained by Debbie Gimer in May 1992 to represent her in a dissolution of marriage matter. She spoke to nonlawyer employee Matthew Kemp on her initial visit to the respondent's office and she signed an attorney-client agreement. Kemp advised Gimer to not make her home mortgage payment because her husband would be ordered at the temporary orders hearing to make the payment himself. Following Kemp's advice, Gimer paid the $700 for her mortgage to the respondent as an advance fee instead. No temporary orders hearing was held, however, and the lender threatened to start foreclosure proceedings. Gimer was forced to borrow the money to make the payment and the $30 late fee.
Although Gimer's husband was served with the dissolution petition on May 15, 1992, the respondent did not file the petition with the court. Letters from the husband's lawyer were not answered and Gimer's calls requesting information were not returned.
In August 1992, Gimer obtained a new lawyer, who asked Kemp to return Gimer's file. Gimer's file was not returned. The new lawyer tried to telephone and wrote letters to the respondent. The lawyer did not receive any documents or the substitution of counsel form from the respondent until September 1992. In September, Gimer's lawyer wrote to the respondent and requested a full refund of the fee Gimer had paid the respondent. The respondent did not reply to the letter and has not returned any of Gimer's funds.
The respondent's conduct violated DR 3-101(A) (aiding a nonlawyer in the unauthorized practice of law), DR 6-101(A)(3) (neglect), and DR 9-102(B)(4) (failing to promptly return client funds upon request). In the Gimer matter the respondent again violated C.R.C.P. 241.6(7). The hearing board also found that the respondent's failure to file the petition and schedule a temporary orders hearing caused Gimer considerable harm, since she did not receive any interim maintenance or child support for her two children and she had to borrow money to make her mortgage payment.

II. No. 96SA33
The hearing board in No. 96SA33 was presented with a partial stipulation of facts and rule violations between the parties. After listening to the testimony of the witnesses, including the respondent's own testimony, and considering the exhibits introduced into evidence, the board determined that the following had been established by clear and convincing evidence.

A.
On June 29, 1992, Sherian Roberts met with Matthew Kemp, the respondent's paralegal.[1] Kemp entered into an agreement on behalf of the respondent whereby the respondent would represent Roberts in a dissolution of marriage proceeding. Roberts signed the dissolution petition in the presence of a notary public on July 6, 1992. She paid $725 for the respondent's legal services and $88 for filing fees.
When Roberts tried to call Kemp in October 1992 to find out what had happened in the case, she learned that his office telephone had been disconnected. She obtained the respondent's telephone number from a telephone company.
About October 23, 1992, the respondent provided a waiver of service to be signed by Roberts's husband. Roberts obtained his signature and delivered the waiver to the respondent personally on October 31, 1992. Although he told her that the petition would then be filed, he did not file the documents at that time.
In January 1993, Roberts contacted the respondent to ask whether a court date had *1301 been set and the respondent told her he would look into it. He did not tell her that he had not even filed the dissolution petition yet. When Roberts contacted the court, however, she found out that it had not been filed. The respondent finally filed the petition in February 1993, and the next month he prepared and mailed a temporary settlement agreement to Roberts's husband. The temporary settlement agreement provided that Roberts's husband would pay $200 a month in child support. The agreement was signed by both parties and returned to the respondent, who never filed it.
Whenever Roberts contacted the respondent thereafter to ask why there had been no progress in the case, he could give her no legitimate answers. In January 1994, she found out from the district court that the petition and affidavit were the only papers filed. There was no record of her husband being served; and no child support, custody, or visitation documents had been filed. With the respondent providing no further services, Roberts wrote to the respondent on March 31, 1994, and instructed him to withdraw.
Roberts moved to Arizona, pursued the matter on her own and obtained an Arizona divorce in October 1994. No child support payments were made by client's husband during the time that the dissolution was pending notwithstanding the settlement agreement the respondent did not file. The Arizona court denied Roberts's request that her husband pay the child support that accrued while the divorce was pending.
The respondent violated DR 6-101(A)(3) and R.P.C. 1.3 (neglect); DR 7-101(A)(1) (intentionally failing to seek the client's lawful objectives); R.P.C. 1.4(a) (failing to keep a client reasonably informed about the status of a matter); and R.P.C. 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit or misrepresentation).

B.
Madalene G. Relford filed a pro se complaint in federal district court against the Veterans Administration (V.A.), alleging that she had been discriminated against. While employed with the V.A., Relford had filed numerous civil rights complaints against her employer.
After filing the pro se complaint, Relford hired the respondent to review her case and to make appropriate recommendations or corrections. She paid him $100 initially and agreed to pay the respondent at the rate of $100 per hour when she could afford to do so. At one point, she asked the respondent to put his advice to her in writing, but he did not. The respondent filed his entry of appearance in the federal district court on September 18, 1992, along with a motion for extension of time in which to "properly file" the case.
As he started to prepare an amended complaint, the respondent concluded that Relford entered into a settlement agreement with the V.A. in 1991 with respect to some of the issues raised in her complaint and that she had not exhausted her administrative remedies on others. He intended to allow the complaint to be dismissed and to file a new complaint once Relford had exhausted all of her administrative remedies. He did not tell Relford this, however.
The federal district judge on January 19, 1993 denied the respondent's September 18, 1992 motion for extension of time because it did not comply with a local rule requiring proof of service on the parties. By the same order, the respondent's client was ordered to show cause by January 25, 1993 why her complaint should not be dismissed for failure to prosecute. Copies of the order were mailed to the respondent and to his client. Because neither the respondent nor Relford responded to the order to show cause, Relford's complaint was dismissed without prejudice.
Relford fired the respondent in October 1994 and asked him to return her file, which he said he would do. Relford nevertheless had to file the request for investigation in this matter before the respondent returned her documents.
*1302 The hearing board concluded that the respondent's failure to promptly return Relford's file violated R.P.C. 1.16(d) (failing to take reasonable steps upon termination of representation to protect a client's interests, such as surrendering papers and property to which the client is entitled).[2]

C.
On July 8, 1993, Wanchai Hongdoxmai, a self-employed computer consultant, hired the respondent to collect a delinquent account in the amount of $1,188.47. He paid the respondent $200 as a retainer in the collection case, which was not resolved to Hongdoxmai's satisfaction. The board found that the respondent did not communicate adequately with his client regarding the status of the case, contrary to R.P.C. 1.4(a).[3]

III.
The hearing board in No. 95SA99 recommended that the respondent be suspended from the practice of law for three years with reinstatement conditioned upon making restitution and demonstrating that certain emotional problems no longer impair the respondent's ability to practice law. The board in No. 96SA33 recommended that the respondent be suspended for thirty days, be required to petition for reinstatement and to make certain restitution. The assistant disciplinary counsel has not excepted to the recommendations, but the respondent has.

A.
The respondent's first challenge is to the constitutionality of the entire lawyer discipline process. In particular, he asserts that the combination of the investigative, prosecutorial, and adjudicative functions in the Office of Disciplinary Counsel, the supreme court grievance committee and the supreme court itself, violates due process. We have considered and rejected this precise argument recently in People v. Varallo, 913 P.2d 1 (Colo.), cert. denied, ___ U.S. ___, 117 S.Ct. 80, 136 L.Ed.2d 38 (1996):
The gist of the respondent's argument is that this court wields complete control over five components of the discipline process: rule-making, investigation, prosecution, decision-making, and appeal. For practical purposes, however, the court entirely controls only the rule-making and appeal functions. The investigative, prosecutorial, and decision-making functions are delegated to the disciplinary counsel and to the grievance committee.
Moreover, the investigative and prosecutorial functions are exercised by the Office of Disciplinary Counsel and the inquiry panel, and are functionally separate from the decision-making function of the hearing board and hearing panel. No member of the hearing board or hearing panel can exercise investigative or prosecutorial functions because of the separation between the inquiry panel and hearing panel, C.R.C.P. 241.2(c), and between the Office of Disciplinary Counsel and hearing panel. The fact that the members of the grievance committee and the disciplinary counsel are appointed by the supreme court is not enough by itself to establish a per se violation of due process.
913 P.2d at 4. The respondent's brief advances no reasons for us to reexamine our holding in Varallo, and we decline to do so.

B.
The respondent's second exception is that the lawyer discipline procedure does not entitle him to "appellate" review. The *1303 lawyer discipline procedure was discussed in Varallo, 913 P.2d at 1-4. Our review of the proceedings before the hearing board and panel is in fact similar to both judicial review of agency action and traditional appellate review. For example, this court is bound by the factual findings of the hearing board unless those findings are clearly erroneous and not supported by substantial evidence in the record: "[W]e hold that the factual findings of the Grievance Committee are binding upon this court unless, after considering the record as a whole, we conclude that they are clearly erroneous and unsupported by substantial evidence." People v. Gibbons, 685 P.2d 168, 173 (Colo.1984). We review questions of law de novo as we would in any appeal. The respondent has provided us with no cogent reason to conclude that lawyer discipline procedures violate due process because he is not entitled to traditional appellate review under that name.

IV.
Under the ABA Standards for Imposing Lawyer Sanctions (1991 & Supp.1992) (ABA Standards), in the absence of mitigating factors, disbarment is generally appropriate when:
(a) a lawyer abandons the practice and causes serious or potentially serious injury to a client; or
(b) a lawyer knowingly fails to perform services for a client and causes serious or potentially serious injury to a client; or
(c) a lawyer engages in a pattern of neglect with respect to client matters and causes serious or potentially serious injury to a client.
ABA Standards 4.41. On the other hand, suspension is generally appropriate when "(a) a lawyer knowingly fails to perform services for a client and causes injury or potential injury to a client; or (b) a lawyer engages in a pattern of neglect and causes injury or potential injury to a client." Id. at 4.42.
The hearing boards found the existence of the following aggravating factors: the respondent exhibited a dishonest or selfish attitude, id. at 9.22(b); there is a pattern of misconduct, id. at 9.22(c); multiple offenses, id. at 9.22(d); the respondent has refused to acknowledge the wrongful nature of his acts, id. at 9.22(g); the respondent harmed victims who were vulnerable, id. at 9.22(h); he has been indifferent to making restitution to the persons he has damaged, id. at 9.22(j); and the respondent has substantial experience in the practice of law, id. at 9.22(i).
In mitigation, the hearing boards found that the respondent has no previous discipline, id. at 9.32(a); and he was experiencing personal and emotional problems at the time of the misconduct, id. at 9.32(c). Neither hearing board found that the respondent had a mental disability which qualified as a mitigating factor under ABA Standards 9.32(i) (Supp.1992):
(i) mental disability ... [may be considered as a mitigating factor] when:
(1) there is medical evidence that the respondent is affected by a ... mental disability;
(2) the ... mental disability caused the misconduct;
(3) the respondent's recovery from the ... mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation; and
(4) the recovery arrested the misconduct and recurrence of that misconduct is unlikely.
The hearing board in 95SA99 found the following with respect to the respondent's mental health problems:
122. In March of 1993, the respondent's wife, concerned about the respondent's behavior, arranged for him to see Dr. Roland Freeman, a psychologist and Catholic priest. Dr. Freeman diagnosed the respondent as suffering from severe depression. The respondent was suicidal and his depression was, at times, virtually immobilizing, and impaired the respondent's ability to make rational judgments. *1304 The respondent has remained in therapy with Dr. Freeman since March of 1993.
....
124. There was no testimony by Dr. Freeman that the respondent's depression caused the misconduct at issue. Moreover, the respondent admits that he is uncertain whether his neglect of legal matters resulted from his depressed state. Additionally, although Dr. Freeman states that the respondent has demonstrated definite improvement since he began therapy, the respondent admits that he still suffers from depression and that he occasionally feels "shut down" and suicidal.
125. Accordingly, the board cannot find that the respondent's mental disability qualifies as a mitigating factor.
Presented with similar evidence of the respondent's depression in No. 96SA33, the hearing board stated:
According to Dr. Freeman, the respondent was incapacitated by his depression and anxiety at the time he began treatment. It is the opinion of Dr. Freeman that the respondent has undergone considerable positive change, particularly in the last few months, and is currently capable of performing professionally. This opinion was qualified, however, by Dr. Freeman's statement that the respondent continues to have some difficulty with his "ability to complete tasks functionally." Dr. Freeman indicated that the respondent is not yet fully rehabilitated and may continue to suffer from episodes of procrastination.
Our own review of the record confirms the conclusion that the respondent's depression does not qualify as a mitigating factor under ABA Standards 9.32(i) (Supp.1992).
The respondent's final claim is that we must consider the Americans With Disabilities Act, 42 U.S.C. §§ 12101 to 12213 (1994) (the ADA), and its relation to his depression in the fashioning of appropriate discipline. Cf. People v. Goldstein, 887 P.2d 634, 638 n. 2 (Colo.1994) (declining to reach a similar issue involving the ADA because it was not addressed in the lawyer's briefs to the court). The respondent "recommends that he be placed on probation for a period of at least a year, during which time he will be monitored by another attorney approved by the Court, will attend therapy weekly, and will pay any monies owed per the recommendations of the boards and panel."
Other courts that have considered the question have held that the ADA applies to state disciplinary proceedings against lawyers. See Florida Bar v. Clement, 662 So.2d 690 (Fla.1995), cert. denied, ___ U.S. ___, 116 S.Ct. 1829, 134 L.Ed.2d 933 (1996); State ex rel. Oklahoma Bar Ass'n v. Busch, 919 P.2d 1114 (Okla.1996). Under the ADA,
[t]he term "qualified individual with a disability" means an individual with a disability who, with or without reasonable modifications to rules, policies or practices,... or the provision of auxiliary aids and services, meets the essential eligibility requirements for ... the participation in programs or activities provided by a public entity.
42 U.S.C. § 12131(2). The Florida Supreme Court addressed the ADA when it disbarred an attorney who was suffering from bipolar disorder (manic depression). Clement, 662 So.2d at 699-700. The lawyer, Clement, argued that the disciplinary referee's recommendation of disbarment violated the ADA. Id. at 699. The Florida Supreme Court held that "the ADA does not prevent this Court from sanctioning Clement." Id. at 700. First, because the lawyer's misconduct, consisting of misappropriation of client funds "was not a direct result of his bipolar disorder, sanctions do not violate the ADA." Id. The hearing board in No. 95SA99 specifically found that the respondent's depression had not been shown to have directly caused his misconduct.
Moreover, the Florida court continued,
even if any of Clement's actions occurred when he could not distinguish right from wrong, the ADA would not necessarily bar this Court from imposing sanctions. "A *1305 person is a `qualified' individual with a disability with respect to licensing if he or she, with or without reasonable modifications, `meets the essential requirements' for receiving the license." This requires a case-by-case analysis of the disabled person and the jobs or benefits he or she seeks. Clement is not "qualified" to be a member of the Bar because he committed serious misconduct, and no "reasonable modifications" are possible....
Thus, while the ADA applies to the Bar, it does not prevent this Court from taking disciplinary action against Clement.
Id. at 700 (citations omitted). Similarly, in Busch, the Oklahoma Supreme Court stated:
From the cases dealing with attorney discipline as well as those dealing with admission, we see that it is still the ultimate responsibility of the Oklahoma Bar Association to protect the integrity of the Bar, and to insure the continued confidence in the Bar by the public. Concededly, this responsibility also includes the duty to follow federal laws as they become applicable to the state.
The ADA clearly applies to the Oklahoma Bar Association, as an arm of this Court. However, ... we see no "reasonable accommodation" which can be made with regard to Respondent's neglect of client matters and deceit in court which would accomplish the purpose of maintaining the integrity of the Bar and promoting the public's confidence in the state's many attorneys. This Court has a constitutional duty in overseeing the Bar to insure that its members are fit to practice.
919 P.2d at 1119.
This case involves the respondent's chronic neglect of client matters, misrepresentations to clients, dishonesty, misuse of client funds, and assisting a nonlawyer in the unauthorized practice of law. In accord with the Florida and Oklahoma supreme courts, we conclude that the ADA does not prevent us from disciplining the respondent. We also find that the alternatives suggested by the respondent will not adequately safeguard the public interest. The extent and seriousness of the respondent's misconduct and the harm that he caused strongly suggests that disbarment is appropriate. Nevertheless, given the factors in mitigation, we accept the hearing panel's recommendations and order that the respondent be suspended for three years, and for thirty days, with certain conditions for reinstatement.

V.
It is hereby ordered that John Kerz Reynolds be suspended from the practice of law for three years in No. 95SA99, and for thirty days in No. 96SA33, to run concurrently, effective thirty days after the issuance of this opinion. It is further ordered that prior to reinstatement, and as a condition of reinstatement, the respondent make restitution to:
(1) Roxanne Eide in the amount of $1,000 plus statutory interest from July 13, 1992;
(2) Jan Schumacher in the amount of $700 with statutory interest from August 31, 1992;
(3) Carl L. Schroeder in the amount of $1,000 with statutory interest from October 31, 1992;
(4) Donna Vidamour in the amount of $312 with statutory interest from May 8, 1992;
(5) Tracy Hudson in the amount of $550 with statutory interest from August 7, 1992;
(6) Debbie Gimer in the amount of $612 with statutory interest from May 31, 1992; and
(7) Sherian Roberts in the amount of $725 with statutory interest from July 6, 1992.
The respondent is further required to demonstrate, as a condition of reinstatement, that his emotional problems no longer impair his ability to practice law. The respondent is ordered to pay the combined costs of these proceedings in the amount of $1,672.75 to the Supreme Court Grievance Committee, 600 Seventeenth Street, Suite 920-S, Dominion *1306 Plaza, Denver, Colorado 80202, within ninety days after the announcement of this opinion. Finally, respondent shall not be reinstated until after he has complied with this order and C.R.C.P. 241.22(b)-(d).
BENDER, J., does not participate.
NOTES
[1] The partial stipulation between the parties and the hearing board's findings in No. 96SA33 characterize Matthew Kemp as the "respondent's paralegal." Kemp was called the respondent's "contract employee" in the findings in No. 95SA99. In any event, Kemp has consistently been described as a nonlawyer and any differences in Kemp's title are immaterial.
[2] Two members of the hearing board determined that it had not been established by clear and convincing evidence that the respondent also violated R.P.C. 1.4(a) by not keeping Relford reasonably informed of the status of her case. The assistant disciplinary counsel has not excepted to this particular finding.
[3] The hearing board also concluded that it had not been proven that the respondent also violated R.P.C. 1.3, R.P.C. 1.15(b), or the rules regarding contingent fee agreements, in the Hongdoxmai matter.